Filed 2/6/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PHILIP ASHBURN et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>AIG FINANCIAL ADVISORS, INC. et al.,<br><br>        Defendants and Respondents. | A138620<br><br>(Alameda County<br>Super. Ct. No. HG09482316) |

Plaintiffs and appellants (appellants) are five former employees of Pacific Bell who took early retirement, with the option to take a pension or a lump sum payment. All appellants chose the lump sum, persuaded to do so by respondent Sharon Kearney, with whom each appellant had significant interaction, having first learned of her from presentations made at the Pacific Bell premises. And all appellants came to be clients of Kearney, in connection with which they signed some documents—exactly what documents and how they came to be signed the subject of vigorous dispute—by which Kearney came to manage and invest appellants' retirement proceeds, in some cases for years. Dissatisfied, appellants sued Kearney and AIG Financial Advisors, Inc. (AIGFA), the successor to the company where Kearney originally worked.

AIGFA filed a petition to compel arbitration, supported in part by a declaration of Kearney. Appellants filed vigorous opposition, which included direct contradiction of many of Kearney's factual representations. Without holding an evidentiary hearing, the trial court granted the petition, ordering appellants' claims to arbitration. That arbitration occurred, with the arbitrators ultimately issuing an award rejecting appellants' claims. After judgment was entered on the award, appellants appealed, arguing their claims should not have been ordered to arbitration, contending among other things that the trial

1

court erred in not holding an evidentiary hearing. We agree such hearing was required in the circumstances here, and we reverse.

## BACKGROUND

### The Parties and the General Background

Appellants are Philip Ashburn, Adela Pena, Lauro Pena, Wiliam Percy, and Karell Wood. All are former employees of Pacific Bell who took early retirement: Wood and Percy in 1997, Adela Pena in 1998, and Lauro Pena and Ashburn in 2002. Each appellant was given the option of receiving a monthly pension from Pacific Bell or taking a lump sum payment. Each appellant ultimately agreed to take the lump sum payment, and each appellant ultimately agreed to allow Kearney to manage and invest their retirement, in connection with which they signed agreements with SunAmerica Securities, Inc. (SAS), Kearney's then-employer. In sum, all of appellants' significant decisions were made in reliance on representations made by Kearney. The meetings and conversations relevant to those representations will be discussed in detail below, as will the documents appellants signed.

Kearney was a registered representative of SAS, and remained such until July 2004. That month she entered into an agreement with Pasquale (Pat) Vitucci to transfer to him certain of her accounts, including those of the five appellants. SAS was ultimately acquired by AIGFA, and for ease of reference and consistency with the briefing, we will refer only to AIGFA.

The investment accounts were opened at various times between 1997 and 2004, and appellants invested their retirement payments in them. Appellants allege that Kearney invested all of their funds in variable annuities, which they claim were unsuitable investments based on their individual circumstances, leading to the legal proceedings here.

### The Procedural Background

#### The Complaint

On October 30, 2009, appellants filed a complaint for damages, naming as defendants AIGFA (and three predecessor entities connected with it) and Kearney. The

2

complaint alleged nine causes of action, styled as follows: intentional misrepresentation; reckless misrepresentation; negligent misrepresentation; fraud—false promise; fraud—omissions; intentional breach of fiduciary duty; negligent breach of fiduciary duty; fraudulent conveyance; and churning.

**The Petition to Compel Arbitration**

On December 2, 2009, AIGFA filed a petition to compel arbitration (petition). It was accompanied by a memorandum of points and authorities, and five declarations, those of Kearney, Marie Meier, Noah Sorkin, Vitucci, and attorney Mark Hancock. Kearney was the only declarant who could testify to any firsthand knowledge of the involvement with any of the appellants, as only she interacted with them.

Kearney's declaration (exclusive of exhibits) was four and a half pages, and provided in pertinent part as follows:

"I, Sharon Kearney, hereby declare as follows:

"1. Unless otherwise noted, I have personal knowledge of the facts set forth herein and, if called as a witness, could competently testify thereto.

"2. In approximately December 1996 I became a registered representative of SunAmerica Securities, Inc. (SAS) and I remained such until July of 2004.

"3. In 2004, Pasquale (Pat) Vitucci was also a registered representative of SAS. On July 15, 2004, Mr. Vitucci and I entered into an agreement whereby I transferred to Mr. Vitucci certain accounts. This included accounts for the following individuals: Philip Ashburn, Connie Johnson, Adela Pena (formerly known as Adela Castro), Lauro Pena, William Percy and Karrell Wood. Pursuant to the terms of that agreement, I transferred to Mr. Vitucci the SunAmerica account files for these individuals.

"4. Plaintiff Philip Ashburn signed an agreement containing an arbitration provision on March 12, 2004 in my presence. I also signed that agreement. Attached hereto as Exhibit A are true and correct copies of pertinent pages of that agreement which Mr. Ashburn and I signed. . . .

"5. Plaintiff Philip Ashburn signed an agreement containing an arbitration provision on May 30, 2002 in my presence. I also signed that agreement. Attached

3

hereto as Exhibit B are true and correct copies of pertinent pages of that agreement which Mr. Ashburn and I signed.

"6. Plaintiff Adela Pena (formerly Adela Castro) signed an agreement containing an arbitration provision on January 17, 1998 in my presence. I also signed that agreement. . . .

Paragraphs 10 through 18 of Kearney's declaration went on to testify in similar fashion concerning appellants Lauro Pena, Percy, and Wood. And her declaration attached as Exhibits A through O what she claimed were the agreements signed by the appellants.

Kearney's declaration then continued:

"19. In the agreements plaintiffs' signed, plaintiffs each acknowledged that the agreements included a pre-dispute arbitration clause.

"20. Attached hereto as Exhibit R is a true and correct copy of a complete, blank, model SAS 'New Account Form,' including the 'Account Agreement' which contains arbitration language, reflecting the edition date of '6/96' in the lower left hand corner. This is the form of agreement which I provided (in its entirety) to, and which was signed by, Adela Pena (formerly Adela Castro) on September 18, 1997 (Exhibit C), by Karrell Wood on November 3, 1997 (Exhibit N), and by William Percy on September 18, 1997 (Exhibit L).

"21. Attached hereto as Exhibit S is a true and correct copy of a complete, blank, model SAS 'New Account Form,' including the 'Account Agreement' which contains arbitration language, reflecting the edition date of '4/97' in the lower left hand corner. This is the form of agreement which I provided (in its entirety) to, and which was signed by, Adela Pena on July 22, 1998 (Exhibit D).

"22. Attached hereto as Exhibit T is a true and correct copy of a complete, blank, model SAS 'New Account Form,' including the 'Account Agreement' which contains arbitration language, reflecting the edition date of '3/98' in the lower left hand corner. This is the form of agreement which I provided (in its entirety) to, and which was signed by, Lauro Pena on May 12, 1999 (Exhibit I.)"

4

Paragraphs 23 through 25 of Kearney's declaration went on to refer to later editions of "complete, blank, model" account forms or account worksheets, copies of which were also attached.

Paragraph 26 of Kearney's declaration referred to a "blank, model six-page" account worksheet which was the form of agreement that she testified each appellant signed on specific dates in March 2004.

Kearney's declaration then concluded as follows:

"27. As part of my practice when working with a client to fill out new account forms and account worksheets, such as those signed by plaintiffs in this matter, I would typically place the client's signature page in the file, but I would not necessarily place all of the pages with the standard arbitration language in the file. This was because these pages were standard forms that could be reproduced by reprinting the applicable version of the form. [¶] I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct."

Kearney's declaration was the sum total of AIGFA's first hand evidence of what it claimed was signed by appellants. Vitucci's declaration testified only that he acquired the accounts from Kearney in 2004, that he had retained the files, and that each appellant "appears to have signed an agreement containing an arbitration provision" on various dates. The three other declarations submitted by AIGFA were those of legal analyst Meier, who provided what she claimed were blank forms; Sorkin, who testified about AIGFA's asset transfer agreements with SAS; and Attorney Hancock, who provided some National Association of Securities Dealers (NASD) and Financial Industry Regulatory Authority (FINRA) forms.

On December 23, 2009, appellants filed their opposition to the petition. It was a 25-page memorandum of points and authorities, whose first argument was that "The Purported Arbitration Agreements Are Void For Fraud in the Execution." The eight-page argument that followed urged that Kearney was a fiduciary to appellants, an argument supported by extensive—and we do mean extensive—testimony from the various appellants, all of whom testified in great detail about their dealings with Kearney.

5

Appellants' second argument in opposition was that "The Arbitration Agreement Did Not Become Part of a Contract With [Appellants]. It Was Provided to Them." This argument, too, was supported by extensive evidence.

Appellants' factual assertions were supported by declarations from each of the appellants, declarations which together totaled 21 pages. In them, each appellant testified at length to his or her numerous dealings with Kearney, and what it is he or she came to sign, and how. The declaration of Lauro Pena is illustrative, where he testified as follows:

"1. I am a plaintiff in the above-entitled action.

"2. I am an early retiree from Pacific Bell. I was offered early retirement in 2002. I had to decide whether to take the early retirement offer, and whether to take a defined benefit pension from Pacific Bell, or a lump sum cash-out, if I chose to retire early.

"3. Long before I decided to take early retirement, I attended at least one seminar given by Ms. Kearney, at the premises of Pacific Bell, to seek her financial advice. Ms. Kearney told me, at this seminar, that, if I took early retirement, and elected the lump sum cash-out, I would receive more money each month for the rest of my life, than what the pension would have paid, and that there would be money left over for my family when I died. Ms. Kearney told me that, if I took the pension, Pacific Bell would get my money when I died, instead of my family.

"4. After listening to what Ms. Kearney had to say at her seminar, and hearing her financial advice, I went home and thought about what Ms. Kearney had advised. It was more than a year after I had attended Ms. Kearney's seminar, that I received my early retirement offer. After I had received my early retirement offer, and before I decided to take it, I met with Ms. Kearney at my home. At this meeting, Ms. Kearney repeated what she had said at her seminar. Ms. Kearney strongly advised me to take early retirement, and to take the lump sum cash-out. Ms. Kearney told me that, if I took early retirement, and elected the lump sum cash-out, I would receive more money each month for the rest of my life, than what the pension would have paid, and there would be money left over for my family when I died. Ms. Kearney told me that, if I took the pension, Pacific Bell

6

would get my money when I died, instead of my family.  Ms. Kearney told me that I could not go wrong, if I followed her advice.  I did not sign any paperwork with Ms. Kearney at this meeting.

"5.  After thinking some more about what Ms. Kearney had advised at her seminar, and at our one on one meeting, I eventually decided to follow Ms. Kearney's advice.  About a week or two after my first one on one meeting with Ms. Kearney, Ms. Kearney came to my house for a second meeting.  At this second meeting, Ms. Kearney again advised me that I should take early retirement, elect the lump sum cash-out, and invest the cash-out with her.  It was only after having heard Ms. Kearney's advice, for a third time, that I decided to take the early retirement offer, elect the lump sum cash-out and invest the cash-out with Ms. Kearney.

"6.  After Ms. Kearney had convinced me to take early retirement, elect the lump sum cash-out, and invest the cash-out with her, Ms. Kearney gave me numerous forms, and instructed me to sign them.  Ms. Kearney did not explain the forms to me.  Ms. Kearney did not tell me anything about arbitration.  Kearney did not tell me what arbitration meant.  Kearney did not tell me that, by signing the forms, I was giving up my right to a jury trial in the event of a dispute, and agreeing to binding arbitration with no right of appeal.  Ms. Kearney did not tell me that, not only was I losing my right to a jury trial, by signing the forms as instructed, but that I would also be forced to arbitrate in a forum where one of the arbitrators is affiliated with the securities industry.

"7.  I did not read the forms before signing them, because I trusted Ms. Kearney.  Ms. Kearney did not give me sufficient time to read the forms.  My meeting with Ms. Kearney was approximately 30-45 minutes.  There were too many forms for me to read in that time.  I relied upon Ms. Kearney's honesty, and signed the forms where she told me to sign.

"8.  I understand that Ms. Kearney claims that she gave me a Customer Agreement, with language describing arbitration.  She did not.  I kept all of the paperwork Ms. Kearney gave to me.  I do not have a Customer Agreement.

"9. I understand that Ms. Kearney claims that I signed an agreement containing an arbitration provision, March 17, 2004, in her presence. That would have been impossible. I did not meet with Ms. Kearney in 2004, let alone sign anything in her presence."

Each of the appellants filed similar declarations testifying to their interactions with Kearney, differing from Mr. Pena's as to dates, numbers of meetings with Kearney, and other facts unique to him or her. The essential aspects of each appellant's testimony— their reliance on Kearney, and the circumstances of how they came to sign any document—were similar to those of Mr. Pena.

Appellants' opposition also included declarations from their attorneys Jordan Stanzler and Melinda Steuer, both of which had exhibits attached, which exhibits totaled some 500 pages. Included among those exhibits were numerous brochures, fliers, and other marketing materials the attorneys had obtained, most of them in discovery in other lawsuits involving Kearney and/or her employers and/or Vitucci. Those materials indicated that Kearney was allowed to give presentations and meet with prospective clients onsite at the Pacific Bell premises; that Kearney represented she would thoroughly explain Pacific Bell's retirement options, and what they meant to each prospective retiree; and that Kearney would help prospective Pacific Bell retirees with important questions and issues regarding their retirement. Such materials included a 1997 notice from Kearney to a Pacific Bell employee announcing her change of employment to SAS, concluding with this representation: "For our upcoming retirees, I will continue to have informal seminars and informative one-on-one sessions to thoroughly explain what your Pacific Bell offer means to you. I will answer questions like . . . Should I take the offer? What can I live on? Will my money run out? What does the interest rate mean to my lump sum? What impact will the merger have on me?" Kearney's slogan was "Making Your Retirement Simple," and other materials represented that Kearney would simplify the retirement process, eliminate jargon and discuss options in clearly defined terms, anticipate each client's individual needs, and provide a knowledgeable and experienced

team of specialists working directly with Pacific Bell employees. Indeed, these materials represented that SAS would even complete all requisite forms.

Particularly significant here, following the discussion of appellants' evidence in support of their arguments in their memorandum in opposition to the petition, that memorandum observed that "Where, as here, there are material factual disputes as to issues relevant to the enforceability of the arbitration agreements, the proper procedure is to have an evidentiary hearing on the matter." [1] And appellants' memorandum concluded with this last sentence: "If the court believes there are factual disputes which could influence its ruling, plaintiffs respectfully request this honorable court set this matter for an evidentiary hearing."

On December 30, 2009, AIGFA filed a reply memorandum, along with 14 pages of objections to evidence. The objections asserted 23 separate objections, the first 16 to attorney Steuer's declaration, the last seven to a portion of attorney Stanzler's declaration and five exhibits referred to in it. AIGFA's reply also included a supplemental declaration from Kearney, which declaration was all of six paragraphs long, not one word of which took issue with any of the facts set forth in any appellant's declaration. [2]

---

[1] For support of this proposition appellants cited: *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 (*Rosenthal*); *Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938 (*Brown*); *Hotels Nevada v. L.A. Pacific Center, Inc.* (2006) 144 Cal.App.4th 754 (*Hotels Nevada*).

[2] The essence of Kearney's declaration was that she agreed to be bound by any arbitration award, the declaration reading in its substantive entirety as follows:

"2. I understand that I have been named as a defendant in the October 30, 2009 Complaint filed in this action . . . .

"3. I understand that the other defendants in this action have filed a Petition to Compel Arbitration (the Petition) based, in part, on a declaration I provided which was dated November 24, 2009. . . .

"4. I also understand that the court intends to refer all claims alleged in the Complaint, against all defendants, to arbitration before the Financial Industry Regulatory Authority (FINRA), in accordance with the Arbitration Agreements, if I: (a) make a general appearance in this action: and (2) agree to submit to FINRA arbitration the claims alleged against me in the Complaint.

9

Interestingly, despite that AIGFA provided no evidence contrary to that introduced by appellants, AIGFA's reply memorandum states, however conclusorily, that appellants' "argument that they were never provided with copies of the arbitration provisions is both false and irrelevant." And, the reply went on, "As explained below, Ms. Kearney and Mr. Vitucci each provided Plaintiffs with the New Account/Customer Agreements containing the arbitration provisions, and their claims to the contrary are not credible and are directly impeached by their own written and signed representations."

That was the setting against which the petition was to be heard: voluminous and specific testimony from appellants as to their interactions with, and reliance upon, Kearney, the advice she had given them, the circumstances surrounding all those interactions, and how they came to sign whatever it is they signed. And AIGFA's assertion that appellants' position was "false," their positions "not credible."

The petition to compel was scheduled for a continued hearing on January 22, 2010, having been continued from January 7.[3] Prior to that date, the court published a tentative ruling granting the petition, which became the order of the court. The order was eight paragraphs long and, making absolutely no reference to appellants' request for a hearing, began as follows: "Petitioners have provided prima facie evidence that each Plaintiff signed a contract expressly incorporating by reference an arbitration agreement. Plaintiffs have failed to provide any facts which, if true, would demonstrate that the contract is void due to fraud in the execution because a Defendant breached some fiduciary duty to a Plaintiff, under *Rosenthal v. Great Western Fin. Securities*

_____

"5. Based on, and subject to, my understanding expressed in paragraph 4 of this declaration, I agree to make, and hereby do make, a general appearance in this action, in order to dispense with the necessity of personal service of the Complaint on me.

"6. Also based on, and subject to, my understanding expressed in paragraph 4 of this declaration, I agree to submit to FINRA arbitration the controversy existing between plaintiffs and me, as alleged in the Complaint, in accordance with the Arbitration Agreements."

[3] The petition was continued from that day because counsel for appellants advised the court that they had been unable to serve Kearney.

10

*Corp.*[*, supra,*] 14 Cal.4th 394, *Brown v. Wells Fargo Bank, N.A.*[*, supra,*] Cal.App.4th 938, or *Hotels Nevada v. L.A. Pacific Center, Inc.* [*,supra,*] 144 Cal.App.4th 754. Plaintiffs have also failed to demonstrate that the parties somehow failed to incorporate the arbitration agreement into their contracts."

Following six short paragraphs addressing issues not pertinent here, and making no ruling on any evidentiary objection, the order concluded as follows: "Based upon the foregoing, the Petition is GRANTED and this action is STAYED pending further order of the Court. Plaintiffs, Petitioners and (through her consent) Defendant Sharon Kearney are ORDERED to submit to arbitration before the Financial Industry Regulatory Authority (FINRA). The Court will place the matter on the compliance/dismissal calendar on October 21, 2010, for review of the status of the arbitration and will dismiss this matter if all proceedings are concluded by then."

### The Arbitration

An arbitration before a three-member FINRA arbitration panel began on January 7, 2013 and concluded on January 18. On January 31, the arbitrators issued their award, as follows:

"**AWARD**

"After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

"1. Claimants' claims are denied in their entirety.

"2. Any and all relief not specifically addressed herein, including punitive and exemplary damages, is denied."

### The Judgment

On March 14, 2013, the trial court entered judgment confirming the arbitration award, from which appellants filed a timely appeal.

## DISCUSSION

### The Appeal Is Properly Before Us

Preliminarily we must address an issue unrelated to the substance of the appeal: AIGFA's motion to dismiss it. In July 2013, AIGFA filed a motion to dismiss the appeal, asserting two grounds: (1) appellants appealed from a stipulated judgment, and no exception to the rule that stipulated judgments are not appealable is applicable; and (2) appellants failed to move to correct or vacate the arbitration award before the trial court.

Appellants filed opposition to the motion to dismiss, which included a declaration of appellants' attorney Steuer, who testified in detail as to what occurred in the trial court leading to the stipulated judgment, testimony supported in its entirety by accompanying exhibits. Ms. Steuer's testimony was as follows:

In early February 2013, AIGFA's attorney Hancock advised her that he thought each side should file a separate status report for the upcoming case management conference. Ms. Steuer did so, and in it she "informed the Court and opposing counsel that 1) plaintiffs were reserving the right to appeal the court's order granting the petition to compel arbitration; 2) plaintiffs opposed dismissal of their complaint because that could constitute a waiver of their right to appeal; and 3) plaintiffs wished to have judgment entered on the award so that their appeal could proceed." This status report was accompanied by Ms. Steuer's declaration, which among other things expressly "requested that the court enter judgment on the arbitration award so that the plaintiffs' appeal may proceed."

Ms. Steuer's declaration to us then testified to what occurred at the status conference below, and after it:

"I attended the status conference with the trial court on this matter via court call on February 28, 2013. At this status conference, the trial court suggested that the parties stipulate to the entry of judgment, because both sides had requested it in their Status Conference Statements, and a stipulated judgment would avoid the need for either or both of the parties to go through the exercise of filing a petition for an order confirming the

12

arbitration award. I reiterated that plaintiffs intended to appeal from the court's order granting the petition to compel arbitration and were seeking entry of judgment for the purpose of obtaining an appealable judgment. I also stated that plaintiffs would be willing to stipulate to a judgment in order to allow their appeal to proceed. Mr. Hancock responded that he did not believe that the order granting arbitration was reviewable, but that he believed his clients would be willing to stipulate to a judgment so long as their stipulation was not construed as an agreement that plaintiffs had the right to appeal the order granting arbitration. At the conclusion of the conference, it was decided that the parties would stipulate to a judgment confirming the award for the sake of judicial efficiency, but that if the parties were unable to agree on the wording of a stipulated judgment, then [AIGFA] would file a petition to confirm the award.

"On March 11, 2013, Mr. Hancock sent me a proposed stipulation to enter judgment and a proposed judgment which stated that the arbitration award shall be confirmed and the complaint dismissed with prejudice. At no time did plaintiffs, nor I on behalf of plaintiffs, indicate that the plaintiffs had changed their mind about appealing the ruling compelling arbitration. On the contrary, I amended the stipulation and proposed judgment to add language which stated that judgment shall be entered upon the award. I made this proposed amendment because I believed that the entry of judgment was necessary in order for the appeal to proceed. I also deleted language in the proposed stipulation which called for dismissal of the complaint with prejudice. I deleted that language because I believed that a dismissal could have had the effect of barring an appeal. On March 12, 2013, Mr. Hancock responded that the changes were acceptable and attached the documents for signature. Mr. Hancock also reminded me that, in stipulating to the judgment, he was not agreeing that plaintiffs/claimants have the right to appeal the order granting the petition to compel arbitration."

AIGFA filed a reply on its motion to dismiss, which reply did not contain any declaration from anyone. In short, the reply did not take issue with any aspect of Ms. Steuer's testimony.

Following that reply, we entered an order on August 7, 2013, denying the motion without prejudice. We now deny it with prejudice.

As to the first ground, the undisputed factual record leading to the stipulated judgment demonstrates that the stipulated judgment was only to allow for an appeal of the order granting the petition to compel arbitration. It is equally clear that AIGFA was fully aware that appellants intended to appeal that order, and were consenting to the entry of judgment for that purpose, which judgment is required in order to obtain review of an order compelling arbitration. Finally, and importantly, the stipulated judgment was advised and encouraged by the trial court as the most efficient way to obtain the judgment that both parties had requested in their status conference statements. The appeal is proper, the stipulation for judgment having been merely to facilitate the appeal. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 399–403; see *Martinez v. Robledo* (2012) 210 Cal.App.4th 384, 387, fn. 2; *Monticello Ins .Co. v. Essex Ins. Co.* (2008) 162 Cal.App.4th 1376, 1383–1384.)

AIGFA's second ground for dismissal is that appellants failed to move to correct the arbitration award. In claimed support of this argument, AIGFA cites several cases, all of which involved appeals in which the appellant was attacking the arbitration award. But this is not appellants' position here, which attacks the order granting the petition to compel arbitration.

An order granting a petition to compel arbitration is not appealable, but is reviewable on appeal from a subsequent judgment on the award. (Code Civ. Proc., §§ 1294 & 1294.2; *Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 648–649.) That, of course, is what appellants are doing here. And properly—and without the need to seek to vacate the award.

*United Firefighters of Los Angeles v. City of Los Angeles* (1991) 231 Cal.App.3d 1576 is illustrative. There, in the course of a lengthy opinion, the Court of Appeal held that the failure by the city to timely request vacation of the arbitration award did not prohibit it from arguing on appeal that the firefighter lacked standing to lodge a grievance subject to arbitration. Put otherwise, the court held that the city was not required to

14

attempt to vacate the award to argue that arbitration should not have been compelled: "We think it clear, however, appellants are not appealing the correctness of the award. Rather, they are attacking the authority of the trial court to compel them to submit the matter to arbitration. An order to compel arbitration is an interlocutory order which is appealable only from the judgment confirming the arbitration award, or in certain exceptional situations is reviewable by writ of mandate. [Citations.] As Professor Witkin has observed: 'A party does not waive his right to attack the order by proceeding to arbitration; the order is reviewable on appeal from a judgment confirming the award. [Citations.]' [Citation.] [¶] "We also think it important to note that because appellants had nothing new to add to their opposition to the arbitration, requiring them to make a request to vacate the award would be a needless act and a waste of judicial resources." (*Id.* at pp. 1581–1582.)

To the same effect is *Maaso v. Signer* (2012) 203 Cal.App.4th 362, 370–371, which ended its discussion on the issue this way: "We agree with Signer that had he brought a motion to vacate the second arbitration hearing on the same grounds he had asserted two years earlier before the same trial judge, the ruling would undoubtedly have been the same and would have been waste of judicial resources." (Quoting *United Firefighters of Los Angeles v. City of Los Angeles, supra,* 231 Cal.App.3d at p. 1582.)

In sum, the appeal is properly before us, and we thus turn to the merits of that appeal, and conclude that merit it has.

**The Court Should Have Held An Evidentiary Hearing**

Juxtaposing the order of their arguments below, appellants first assert that the arbitration agreements were not contained in the forms appellants signed, but in a separate document that was not properly incorporated by reference. Elaborating, appellants begin this argument as follows:

"The arbitration agreement at issue are [*sic*] not contained in the NAFs and/or Account Worksheets which appellants signed and/or which respondents claim appellants signed. Instead, it is contained in a separate document, entitled 'Account Agreement' or 'Customer Agreement'. Appellants each attested that the Account/Customer Agreement

15

with the arbitration agreement was NOT provided to any of the appellants, before, nor at the time, they signed the NAFs/Account Worksheets which purported to incorporate the separate Account/Customer Agreement. If appellants' attestations are true, then the arbitration agreement could not have become part of any contract with appellants, and there is no enforceable agreement to arbitrate.

"The issue of whether the Account/Customer Agreements which contained the arbitration agreement were provided or reasonably available to appellants prior to, or at the time, they signed the NAFs/Account Worksheets was a material disputed fact. This factual dispute could only have been resolved through an evidentiary hearing. The trial court denied appellants' request for an evidentiary hearing. Appellants were never given the opportunity to prove that the arbitration agreements were not provided nor reasonably available to them, and that there was no valid incorporation."

Along the same lines, appellants' second argument here contends that the purported arbitration agreements are unenforceable for fraud in the execution. That argument proceeds for over 10 pages, in the course of which appellants rely on their testimony about the extent and nature of their interactions with Kearney, testimony, appellants assert, that demonstrated a fiduciary relationship.

As noted, the trial court's order began as follows: "Petitioners have provided prima facie evidence that each Plaintiff signed a contract expressly incorporating by reference an arbitration agreement. Plaintiffs have failed to provide any facts which, if true, would demonstrate that the contract is void due to fraud in the execution because a Defendant breached some fiduciary duty to a Plaintiff, under *Rosenthal v. Great Western Fin. Securities Corp.*[*, supra,*] 14 Cal.4th 394, *Brown v. Wells Fargo Bank, N.A.*[*, supra,*] 168 Cal.App.4th 938, or *Hotels Nevada v. L.A. Pacific Center, Inc.* [*, supra,*] 144 Cal.App.4th 754. Plaintiffs have also failed to demonstrate that the parties somehow failed to incorporate the arbitration agreement into their contracts."

In light of the record here, we do not understand how the trial court could have made such a finding without an evidentiary hearing.

16

The general background begins with the tenet that the law favors enforcement of arbitration agreements.  (*Armendariz v. Foundation Health Psychcare Services* (2000) 24 Cal.4th 83, 96–97.)  The applicable statute mandates that a court shall order arbitration "if it determines that an agreement to arbitrate the controversy exists . . . ."  (Code Civ. Proc., § 1281.2.)  "The petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense."  (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)  In sum, arbitration must be compelled where the petition shows a written agreement to arbitrate, a controversy between the parties that is subject to that agreement, and the other party's refusal to arbitrate.  (Code Civ. Proc., § 1281.2.)

And as to how that petition is generally to be determined, Code of Civil Procedure section 1290.2 provides that the petition is heard "in a summary way in the manner . . . provided by law for the making and hearing of motions."  That "manner" does not entitle one to an evidentiary hearing.

Case law, however, has added a caveat, illustrated by the California Supreme Court's discussion in *Rosenthal, supra,* 14 Cal.4th 394, a case, like here, involving investors who sued a securities company.  Defendants petitioned to compel arbitration, which was denied, and defendants appealed.  While the Supreme Court reversed on that issue, it did so with the following observations in response to the defendants' argument that the court must hold a "bench trial":

"[H]earing and determination 'in the manner . . . provided by law for the . . . hearing of motions' ([Code of Civ. Proc.,] § 1290.2) would ordinarily mean the facts are to be proven by affidavit or declaration and documentary evidence, with oral testimony taken only in the court's discretion.  [Citations.]  [¶] GWFSC nevertheless maintains that when the declarations and documentary evidence present a material factual dispute as to the existence or enforceability of the arbitration agreement, 'the trial court must proceed to a summary bench trial' of the issues.  In cases of this sort, GWFSC insists, 'the failure to resolve a material issue of fact by an evidentiary hearing is an abuse of discretion.'

17

We decline to embrace the broad rule proposed by GWFSC. There is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony. Nonetheless, we agree that where—as is common with allegations of fraud such as are made here—the enforceability of an arbitration clause may depend upon which of two sharply conflicting factual accounts is to be believed, the better course would normally be for the trial court to hear oral testimony and allow the parties the opportunity for cross-examination. As the trial court here remarked, 'it's pretty difficult to weigh credibility without seeing the witnesses.' " (*Id.,* at pp. 413-414.)

Elaborating on *Rosenthal*, *Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1219-1220, explained it this way: "Thus, our Supreme Court has clearly stated that a court, before granting a petition to compel arbitration, *must* determine the factual issue of 'the existence or validity of the arbitration agreement.' (*Rosenthal, supra,* 14 Cal.4th at pp. 402, 413.) In this way, a court's role, though limited, is critical. 'There is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate and which no statute has made arbitrable.' (*Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481.)" The court went on to remand the matter for such factual determination even after the arbitration had been held. (*Toal v. Tardif, supra,* 178 Cal.App.4th at p. 1224.)

Here, as indicated above, there is no indication in the record that the trial court exercised any discretion. Such failure to exercise discretion is "itself an abuse of discretion." (*Marriage of Gray* (2007) 155 Cal.App.4th 504, 515.) As we put it in *Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392, " 'Failure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal.' "

But even if the record could be read to show that the trial court exercised its discretion, we would hold that discretion was abused, in light of the significant factual issues presented here.

18

*Hotels Nevada, supra,* 144 Cal.App.4th 754 is persuasive. The dispute there was between a buyer and seller in a real estate transaction. The buyer filed a petition to compel arbitration; the seller opposed it, contending that its *allegations* of fraud in the execution rendered the agreement void. The trial court denied the petition, stating that if the facts were as alleged, there would have been no contract. (*Id*. at pp. 760–761.)

The Court of Appeal reversed, beginning its opinion with reference to *Rosenthal*, with the observation that "[t]he role of the trial court is to sit as a trier of fact, weighing any affidavits, declarations, and other documentary evidence, together with oral testimony received at the court's discretion, to reach a determination on the issue of arbitrability. [Citation.] Thus, the trial court was required to hold an evidentiary hearing before, not after, ruling on appellant's motion to compel arbitration." (*Hotels Nevada, supra,* 144 Cal.App.4th at p. 758.) The court then went on to distinguish between fraud in the inducement and fraud in the execution—the fraud appellants assert here—and how fraud in the execution would preclude a contract, and therefore arbitration. The court then remanded, directing the trial court "to conduct an evidentiary hearing." (*Id.* at pp. 763-764, 766.)

Likewise making the point is *Bouton v. USAA Casualty Ins. Co.* (2008) 167 Cal.App.4th 412, 428, where, following quotation from *Rosenthal*, the Court of Appeal concluded as follows: "Applying that same rationale to this case, it likely will be the better course for the trial court on remand to hear oral testimony of witnesses in the event the affidavits, declarations, and other documentary evidence submitted by the parties are sharply conflicting on the question whether Bouton is an insured under the Policy." The leading practical treatise sums it up this way: "[5.133.2] **Affidavits vs. oral testimony:** Detailed factual affidavits or declarations are usually required. Oral testimony is discretionary with the court. But where the facts are in dispute or credibility issues are involved (which is usually the case when fraud is claimed), 'the better course' is for the trial court to hear oral testimony and allow the parties the opportunity for cross-examination. [Citations.]" (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2014) ¶ 5.133.2, p. 5-117.)

19

Those cases and commentary, and the policy reflected in them, demonstrate that the trial court had to hold an evidentiary hearing here, as there was significant dispute about what appellants signed, how they came to sign it, and what they signed said—not to mention extensive evidence of the significant relationship Kearney had with each appellant before they signed anything.

By way of introduction to the issue, the parties do not even agree as to what the pertinent documents are even called. Thus, for example, responding to appellants' descriptions of various documents in the opening brief—descriptions, as best we can tell, that are based on the on the label of the documents themselves—AIGFA's brief says that "Appellant's references to the account agreements is confusing. Appellants refer to the New Account Form and Customer Account Form as the 'NAF' and refer to the Account Worksheet as the "Account Worksheet." In addition, Appellants refer to the page containing the arbitration provision as the 'Account Agreement,' and Appellants further assert that the 'NAF,' the 'Account Worksheet' and the 'Account Agreement' are all separate documents. What Appellants call the New Account Form, Customer Agreement, NAF, and Account Worksheet are different versions of account agreements, which all contained identical arbitration provisions."

AIGFA's position is that the page(s) signed by each of the appellants states that there is a predispute arbitration provision located in a separate document. Specifically, AIGFA's position is that "on page 3 of the account agreement all appellants signed, the following language appears immediately above their signatures: [¶] In consideration of your opening and/or carrying one or more accounts on my behalf, I hereby acknowledge that I have received, read, understand and agree to the terms set forth in the Customer Agreement of this application and the Disclosure of Credit Terms on Transactions. [¶] The Customer Agreement contains a pre-dispute Arbitration Provision. This Provision is contained in this agreement and appears in bold print. I hereby acknowledge by my signature below, receipt of a copy of this agreement."

And AIGFA's brief goes on, quoting from what Kearney describes as the "Agreement" "containing an arbitration provision," to assert that four appellants, Percy,

Wood, and both Penas, "signed an account agreement which states in pertinent part: I/we acknowledge that this agreement includes a pre-dispute arbitration clause located on the back of this form [Section 10(B)]. I/we acknowledge receiving a copy of this new account form and I/we have had the opportunity to read it and I/we understand it. Furthermore, I/we have read all information on this New Account Form. I have reviewed the terms and conditions of this agreement including all information contained on the reverse side hereof." Thus, even under AIGFA's version of facts, the actual arbitration provision, and the supposed disclosures about what arbitration means, were not on the signature page, nor on any of the pages which preceded it. Instead, the arbitration provision, and the description of what arbitration means, were on a separate, self-contained, preprinted document.

But AIGFA's version of facts was hotly disputed. While, as noted, each appellant did sign a new account form that refers to an arbitration provision, each appellant testified that Kearney never provided the "Account Agreement/Customer Agreement"— the document that contained the arbitration provision and described what arbitration means.

To illustrate, we again refer to Mr. Pena, who testified in point blank terms as follows:

"8. I understand that Ms. Kearney claims that she gave me a Customer Agreement, with language describing arbitration. She did not. I kept all of the paperwork Ms. Kearney gave to me. I do not have a Customer Agreement.

"9. I understand that Ms. Kearney claims that I signed an agreement containing an arbitration provision, March 17, 2004, in her presence. That would have been impossible. I did not meet with Ms. Kearney in 2004, let alone sign anything in her presence."

Like Mr. Pena, all other appellants testified they did not receive the account agreement when they signed the new account forms.

And while AIGFA asserts that the arbitration agreement is part of the same, single, multi-page document which the appellants signed, the fact is the customer agreement and

21

the account agreement are separately titled, and completely self-contained, documents. In sum, appellants' position is that they could not have knowingly agreed to the terms of the arbitration agreement at the time they signed the signature page(s), because they did not have any way of knowing what those terms were—and the separate account agreement was not part of any contract with them. [4]

There certainly was abundant evidence that there was no enforceable agreement to arbitrate. Likewise abundant evidence that could support a fiduciary duty.

We begin with the exposition in *Brown, supra,* 168 Cal.App.4th 938, 959–960: " 'Fiduciary' and 'confidential' relationships are relationships existing between parties to a transaction wherein one party is duty bound to act with the utmost good faith for the benefit of the other. Such a relationship ordinarily arises when one party reposes a confidence in the integrity of the other, and the other voluntarily accepts that confidence. [Citation.] ' "[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." ' [Citation.] A stockbroker is a fiduciary, as well. (*Duffy v. Cavalier* [(1989)] 215 Cal.App.3d [1517,] 1531.) ' "The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." ' [Citation.]"

The Court of Appeal then went on, rejecting Wells Fargo's reliance on "authority providing that a stockbroker's fiduciary relationship does not arise until *after* the brokerage agreement has been signed, and therefore does not require additional disclosures at the time of the execution of the agreement." This, the court said,

---

[4] Despite the foregoing facts, AIGFA contends that the recital on the signature pages conclusively proves that appellants received a customer/account agreement from Kearney, and that the court should simply ignore all evidence to the contrary. Such argument has been unequivocally rejected, as, for example, in *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1291, which observed that binding appellants by such a recital would be "impermissible bootstrapping."

22

"overlooks the unique factual circumstances of this case." (*Brown, supra,* 168 Cal.App.4th at p. 961.)

Similarly here. Appellants presented evidence that Kearney held herself out as an expert in helping Pacific Bell retirees, marketing herself as a knowledgeable resource for prospective retirees who faced significant life decisions. Kearney provided specific advice to each of the appellants regarding these decisions, including whether to take a pension or a lump sum on early retirement, advising lump sum, with the further advice that appellants could safely withdraw more from the lump sum than what their pensions would have provided. Kearney influenced each of the appellants to retain her (and her company) to handle their retirements and their retirement investments. And all this before appellants signed one piece of paper. Put otherwise, appellants trusted and relied upon Kearney's advice, and signed whatever they signed only after Kearney had convinced them to trust her.

Such circumstances support the conclusion that Kearney was a fiduciary even before any account papers were signed, as it did the circumstances in *Brown*, which rejected the argument that a securities broker becomes a fiduciary only after a new account agreement has been executed. (*Brown, supra,* 168 Cal.App.4th at pp. 960-961.) There, as here, the broker had formed a relationship of trust and reliance with the plaintiffs, and offered the plaintiffs financial and investment advice before the plaintiffs signed any documents, further explaining that the broker had knowingly induced the plaintiffs to rely upon him to handle their financial affairs, thus creating a fiduciary relationship, even before the signing of the new account agreements. (*Id.* at pp. 960-961.) Appellants' relationship with Kearney was similar.

AIGFA dismisses appellants' relationship with Kearney as "typical" of a "prospective" broker-client relationship, describing its version of Kearney's interactions with appellants, however myopically, this way: "But the 'relationship' between Kearney and Appellants that preceded the signing of the account agreements was minimal. Wood alleged that she and Kearney had 'many' phone conversations over a year (but there is no evidence as to what exactly 'many' means) [citation]. A. Pena attended 'several'

23

seminars Kearney gave at Pacific Bell's offices [citation]. L. Pena attended 'at least one' of Kearney's seminars then more than a year later had two meetings with Kearney in a one to two week period, one of which lasted only 30–45 minutes [citation]. Ashburn and Percy had only one meeting with Kearney before signing the account agreements. [Citations]. [¶] Based on these facts, Respondents and Appellants' pre-agreement relationship was merely that which is typical of a prospective broker-customer relationship."

We read the record differently. Regardless, AIGFA cites no case remotely similar factually to the setting here, no case showing that it is "typical" for a broker to give such extensive, personalized, financial advice about retirement planning and investments over an extended period of time to individuals who have not yet opened accounts with the broker.

As to the ramifications of a fiduciary relationship here, *Brown* is again apt: "This issue usually arises when the plaintiff failed to read the terms of the contract, relying instead on the defendant's representation as to the effect of the contract. Generally, it is *not reasonable* to fail to read a contract; this is true even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract. (*Rosenthal, supra,* 14 Cal.4th at pp. 423–424.) Reasonable diligence requires a party to read a contract before signing it. (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1674.) This presumes, however, that the parties were dealing *at arm's length.* When the parties are in a fiduciary relationship, the same degree of diligence is not required of the nonfiduciary party. (*Stafford v. Shultz* (1954) 42 Cal.2d 767, 777.) If the defendant is in a fiduciary relationship with the plaintiff which requires the defendant to explain the terms of a contract between them, the plaintiff's failure to read the contract would be reasonable. (*Lynch v. Cruttenden & Co.* (1993) 18 Cal.App.4th 802, 808–809; see also *Bruni v. Didion*[*, supra,*] 160 Cal.App.4th [at p.] 1291; [citation].) In such a situation, the defendant fiduciary's failure to perform its duty would constitute constructive fraud (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 854), the plaintiff's failure to read the contract would be justifiable (*Twomey v. Mitchum, Jones & Templeton,*

24

*Inc.* (1968) 262 Cal.App.2d 690, 715), and constructive fraud in the execution would be established." (*Brown, supra,* 168 Cal.App.4th at p. 959, fn. omitted.)

## DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.  Appellants are awarded their costs on appeal.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Stewart, J.

A138620, *Ashburn v. AIG Financial Advisors, Inc.*

| | |
|---|---|
| Trial Court: | Alameda Superior Court |
| Trial Judge: | Honorable Frank Roesch |
| Attorney for Plaintiffs and Appellants: | Law Offices of Melinda Jane Steuer, Melinda Jane Steuer |
| Attorneys for Defendants and Respondents: | White & Woods, Benjamin W. White, Kevin J. Woods |