Filed 5/28/25  Coefficient Group Holding Limited v. Solana Labs CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| COEFFICIENT GROUP HOLDING LIMITED,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>SOLANA LABS, INC.,<br><br>      Defendant and Appellant | A170620<br><br>(City and County of San Francisco Superior Court No. CGC-24-611449) |

Appellant Solana Labs, Inc. (Solana) appeals from a trial court order denying its motion to compel arbitration against respondent Coefficient Group Holding Limited (Coefficient).  We affirm.

I.
BACKGROUND

Coefficient is an investment firm, and Solana is a cryptocurrency business.  In June 2018, Coefficient invested in Solana by transferring to it Ethereum tokens, a type of cryptocurrency, that had an understood market value of $1,025,000.  As part of the transaction, the parties executed two materially identical written investment agreements.  In them, Solana disclosed it was a Cayman Islands entity.

The agreements included a section on arbitration, Section 7, which applied only to "individuals located, resident or domiciled" in the United States." (Capitalization omitted.)

Shortly after the investment transaction, the parties agreed to rescind the deal. A dispute soon arose, however, because the value of the Ethereum tokens had dropped, and Solana did not refund to Coefficient the full value that the tokens had at the time of the original investment.

Coefficient initiated this action by filing a complaint, and Solana responded by filing a motion to compel arbitration under Section 7 of the investment agreements. The trial court denied the motion on the ground that "the parties never entered into an arbitration agreement."

II.

DISCUSSION

A. *General Legal Standards*

1. The standard of review

" ' "There is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the [trial] court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed." ' " (*Fleming v. Oliphant Financial, LLC* (2023) 88 Cal.App.5th 13, 18.)

2. The law governing enforcement of arbitration agreements

The "primary substantive provision" of the Federal Arbitration Act (FAA) is 9 U.S.C. section 2. (*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24.) It states, "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing

2

to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) "In enacting [section] 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." (*Southland Corp. v. Keating* (1984) 465 U.S. 1, 10.) This policy of enforceability was intended " 'to overcome an anachronistic judicial hostility to agreements to arbitrate, which American courts had borrowed from English common law.' " (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1343–1344.) The FAA was designed to be enforceable in state as well as federal courts. (*Keating*, at p. 12.)

"A motion to compel arbitration is essentially a request for specific performance of a contractual agreement. [Citation.] The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an arbitration agreement. [Citations.] The party opposing the petition bears the burden of establishing a defense to the agreement's enforcement by a preponderance of the evidence. [Citations.] In determining whether there is a duty to arbitrate, the trial court must, at least to some extent, examine and construe the agreement." (*Tiri v. Lucky Chances, Inc.* (2014) 226 Cal.App.4th 231, 239 (*Tiri*).)

> ### B.    *The Trial Court Properly Decided the Question of Whether the Parties Entered an Arbitration Agreement*

Solana contends that it was improper for the trial court to decide whether the arbitration agreement was enforceable because the investment agreements provided that JAMS rules and procedures would apply in any arbitration, and JAMS has a rule that arbitrability is to be decided by the

arbitrator. The contention lacks merit because Coefficient raised a threshold issue that must be decided by a court, and not an arbitrator: whether the parties actually entered into an arbitration agreement.

"Parties to an arbitration agreement may agree to delegate to the arbitrator, instead of a court, questions regarding the enforceability of the agreement. [Citation.] They 'can agree to arbitrate almost any dispute—even a dispute over whether the underlying dispute is subject to arbitration.'" (*Tiri, supra,* 226 Cal.App.4th at p. 241.) A delegation to the arbitrator is enforceable so long as it is clear and unmistakable. (*Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 70, fn. 1 (*Rent-A-Center*).)

When, unlike in this case, parties do not contest the existence of an arbitration agreement, challenges to the enforceability of arbitration agreements that have clear delegation clauses are to be decided by the arbitrator, not the court. (*Rent-A-Center, supra*, 561 U.S. at pp. 71–73; see *Tiri, supra*, 226 Cal.App.4th at p. 236.) This remains true even if the arguments favoring the agreement's enforceability are "wholly groundless." (*Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) 586 U.S. 63, 68 [arbitrator must decide in the first instance if claim for injunctive relief was arbitrable even though arbitration agreement excluded such claims].)

But when the existence of an agreement to arbitrate between the parties is disputed, the issue must be decided by a court, not an arbitrator. This is because the delegation of " 'gateway' questions of 'arbitrability' " to the arbitrator "presupposes the existence of an agreement between the parties, which the court necessarily ha[s] to decide before it [can] enforce any such delegation." (*Garcia v. Stoneledge Furniture LLC* (2024) 102 Cal.App.5th 41, 50; see *Gandhi-Kapoor v. Hone Capital LLC* (Del. Ch. 2023) 307 A.3d 328, 356 ["To be satisfied that the parties agreed to arbitrate, the court must

4

determine that an arbitration agreement exists].) "[I]t is a cardinal principle that arbitration under the FAA 'is a matter of consent, not coercion,'" meaning " ' "a party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit." ' " (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.)

Because the issue here was whether any agreement to arbitrate existed between the parties, the trial court properly considered it in the first instance.

### C. *The Trial Court Properly Determined that the Parties Did Not Enter an Arbitration Agreement*

We therefore turn to consider the merits of the trial court's finding that the parties did not enter an arbitration agreement. In doing do, we apply the law of Delaware because Section 8.4 of the investment agreements provided that that state's law was to govern disputes, even as jurisdiction was conferred on California courts.[1] In applying Delaware law, we conclude that the trial court's ruling must stand.

" 'Delaware is a contractarian state that holds parties' freedom of contract in high regard.' [Citations.] ' "When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." ' [Citation.] '[C]lear and unambiguous language is "reasonably susceptible of *only one* interpretation." ' [Citation.] 'Language from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one.' [Citation.] [¶] 'A provision in a contract is ambiguous "when the provision in

---

[1] California courts generally apply the substantive law of the foreign jurisdiction identified in a contractual choice-of-law provision, but they apply California law to procedural matters. (See *Saw v. Avago Technologies Limited* (2020) 51 Cal.App.5th 1102, 1108.)

5

controversy is reasonably or fairly susceptible of different interpretations or may have two or more different meanings." ' [Citation.] ' "Where no ambiguity exists, the contract will be interpreted according to the 'ordinary and usual meaning' of its terms." ' [Citation.] ' "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous." ' " (*Thompson Street Capital Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC* (Del., Apr. 28, 2025, No. 166, 2024) 2025 WL 1213667, at \*7 (*Thompson Street*).)

Under Delaware law, an appellate court " ' "review[s] questions of contract interpretation *de novo*." ' [Citation.] 'Moreover, "whether a contract is unambiguous is a question of law." ' " (*Thompson Street,* 2025 WL 1213667, at \*7.)

Section 7 of the investment agreements began with the following:

> "**Dispute Resolution & Arbitration.**  PLEASE READ SECTIONS 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, AND 7.8 CAREFULLY BECAUSE THEY CONTAIN ADDITIONAL PROVISIONS APPLICABLE ONLY TO INDIVIDUALS LOCATED, RESIDENT OR DOMICILED IN THE UNITED STATES.  IF THE INVESTOR IS LOCATED, RESIDENT OR DOMICILED IN THE UNITED STATES, THIS SECTION REQUIRES THE INVESTOR TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH THE COMPANY AND LIMITS THE MANNER IN WHICH AN INVESTOR CAN SEEK RELIEF FROM THE COMPANY."

Despite Solana's steadfast argument to the contrary, this language is plain, unambiguous, and reasonably susceptible of only one interpretation, particularly when considered in the context of the entirety of the investment agreements.  Expressly included as *part* of the investment agreements were investor questionnaires that contained Coefficient's responses.  The questionnaires' instructions stated, "**If Investor is an entity** . . . , please answer the questions . . . *from the perspective of the entity itself*, rather than

6

from the perspective of the individual who will be signing for the entity." (Bold in original, italics added.) The questionnaires also included a box "**For Entities**," that had a space for the investor to identify the entity's "State/Country of Organization." (Bold in original.) The information Coefficient provided in the space was "Caymen Islands." On the following page of the questionnaires, was a question asking for the entities' "**Street Address**," and in response Coefficient provided an address in the Caymen Islands. When asked whether it was "a 'U.S. Person,' within the meaning of Rule 902(a)(k) under the Securities Act of 1933," Coefficient indicated it was neither a natural person of the United States nor a corporation or other entity organized under the laws of any state of the United States, and it checked a box on the questionnaires stating it was "not a U.S. person." Elsewhere, Coefficient disclosed it was a limited liability company. Nothing in the investment agreements even remotely suggested that Coefficient was residing, domiciled, or located in the United States, and thereby subject to Section 7.

In our view, if any part of the agreements' language was ambiguous, it involved an immaterial term. Section 7's all-capped introduction initially stated that the section applied only to "individuals," but other parts of the agreements made clear that investors could be either individuals or entities. Thus, there may be some ambiguity as to whether Section 7's arbitration provisions applied only to non-United States *individuals* and not to non-United States *entities*. But here we need not be concerned with any such ambiguity because Coefficient does not argue that Section 7 was inapplicable to it by virtue of its status as an entity.

Setting aside that possible ambiguity, it is clear that Section 7's language limiting the arbitration provisions to investors who are "located,

resident, or domiciled" in the United States pertained to the investors' place of registration and geographical address, not to where the investors' business might occur or where their officers or directors might work. Again, the questionnaires unequivocally directed entities to answer questions "from the perspective of the entity itself," and the only information pertinent to our analysis that the questionnaires sought involved the entities' physical place of organization and street address. "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." (*City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*(Del. 1993) 624 A.2d 1191, 1198.)

In arguing that Section 7 should be read to apply to Coefficient, Solana contends that the entity is "located" in California because it has a business presence in the state, and "[t]here is no dispute that Chance Du, a/k/a Du Ganyan, is [currently] the President of Coefficient and runs Coefficient from California." We are not persuaded. To begin with, we agree with the trial court that "[t]he fact that one of [Coefficient's] representatives resides in California does not mean that entity [Coefficient] resides in California." Similarly, the fact that an officer of Coefficient may be located in California or may run the business there, does not mean that the Coefficient entity is located in California.

If Solana had wanted Section 7 to be applicable to entities that conducted business in the United States, had a principal place of business in the United States, or had an officer, director, or, in its words, a "sole employee" working in the United States, it could have simply drafted the investment agreement to say so. It did not. Accordingly, even if we thought that the phrase "located in" was ambiguous, which we do not, we would still affirm the trial court's order, since under Delaware law contractual

8

ambiguities are construed against the drafter, and the parties agree that Solana drafted the investment agreements. (See *Twin City Fire Ins. Co. v. Delaware Racing Ass'n* (Del. 2003) 840 A.2d 624, 630.)

Solana also argues that the language restricting the applicability of Section 7 was tantamount to a preamble with no substantive effect. Specifically, it argues that the clear all-capped statement that Section 7 is "APPLICABLE ONLY TO INDIVIDUALS LOCATED, RESIDENT OR DOMICILED IN THE UNITED STATES" has no substantive effect because other parts of Section 7 simply reference the "investor" as being subject to arbitration. Solana's argument is that notwithstanding the plain, all-capped statement, Section 7 should be read to apply to *all* investors regardless of their location because these other references to "investor" do not include the United States as an adjective. The argument is meritless, and we reject it, as did the trial court. It would mean that a non-United States investor who read the introductory language and did not read the rest of the section, reasonably thinking it would not be bound by it, would nonetheless be so bound.

The plain language restricting the applicability of Section 7 to individuals located, residing, or domiciled in the United States, is unequivocal and substantive. "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." (*E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.* (Del. 1985) 498 A.2d 1108, 1113.) Considering the entirety of the investment agreements, there can be only one view of the "reasonable shared expectation of the parties at the time they contracted": Section 7 applied to United States investors but not to non-United States investors, and Coefficient was a non-

9

United States investor.  (See *Matria Healthcare, Inc. v. Coral* SR LLC (Del. Ch. Mar. 1, 2007), 2007 WL 763303, at *6.)[2]

D.    *The Trial Court Properly Denied Solana's Request for Discovery*

Solana next argues that the trial court erred in denying its requests for discovery and an evidentiary hearing.  The argument fails.

Facts are normally proven on a motion to compel arbitration by affidavit or declaration and documentary evidence, "with oral testimony taken only in the court's discretion."  (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413–414 (*Rosenthal*).)  "There is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony."  (*Id.* at p. 414.)

An exception to this rule can arise when there are "sharply conflicting" versions of the facts and credibility is at issue.  (See *Rosenthal, supra*, 14 Cal.4th at p. 414.)  This exception was discussed in *Ashburn v. AIG Financial Advisors, Inc.* (2015) 234 Cal.App.4th 79.  In *Ashburn*, the trial court granted a petition to compel arbitration and declined to hold an evidentiary hearing notwithstanding starkly differing evidence about the existence and terms of a purported arbitration agreement.  (*Id.* at pp. 86–89, 98.)  The court of appeal reversed, reasoning that "there was significant dispute about what appellants signed, how they came to sign it, and what they signed said—not to mention extensive evidence of the significant relationship [one defendant] had with each appellant before they signed

---

[2] We also reject Solana's apparent contention that the investment agreements' forum-selection clause, which allows for court and arbitration proceedings in California, somehow establishes that Coefficient is bound by Section 7's arbitration provisions.

10

anything," and "the parties do not even agree as to what the pertinent documents are even called." (*Id.* at p. 98.)

Here, there are no starkly different versions of the facts. Both parties agree on the language of the investment agreements, on the fact that they entered into those agreements, and on the information Coefficient provided about itself in response to the questionnaires. They both agree that Coefficient is registered in the Caymen Islands and maintains a physical address there. Solana failed to establish that it needed to conduct discovery on tangential, and ultimately immaterial, issues such as whether Coefficient had business operations in the United States or whether its officers resided in, and conducted business affairs from, California. In short, Solana has not established that it was improperly denied a hearing or the opportunity to engage in discovery. (See *Rosenthal, supra*, 14 Cal.4th at pp. 412–413.)

### III.
### DISPOSITION

The trial court order denying Solana's petition to compel arbitration is affirmed. Coefficient is awarded its costs on appeal.

_____

Humes, P. J.


WE CONCUR:




_____

Langhorne Wilson, J.




_____

Smiley, J.




*Coefficient Group Holding Limited v. Solana Labs, Inc.*  A170620


12