Filed 8/28/25  Prell v. The Lobster CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| CHRIS PRELL, | B339515 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 21STCV47142 |
| v. | |
| THE LOBSTER LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Upinder S. Kalra, Judge.  Affirmed.

Law Offices of David R. Denis, David R. Denis and Armando M. Galvan for Plaintiff and Appellant.

Kull + Hall, Robert F. Kull and Kevin P. Hall for Defendant and Respondent.

Chris Prell appeals from a judgment confirming an arbitration award in favor of his former employer The Lobster LLC.  He contends the court erred in granting The Lobster's motion to compel arbitration.  We find no error and affirm.

**BACKGROUND**

The Lobster is a seafood restaurant in Santa Monica, California.  The Lobster hired Prell as "a server" in September 2007 or 2008.  The Lobster terminated Prell's employment on February 8, 2021.

In December 2021, Prell sued The Lobster for wrongful termination.  His first amended complaint, filed December 29, 2021, alleged several causes of action under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA), including discrimination based on disability and age, as well as causes of action for violations of the California Family Rights Act, retaliation under the Labor Code, wrongful termination in violation of public policy, and defamation.  Among other allegations, Prell alleged he had a medical condition for which he required work modifications and intermittent medical leaves of absence; The Lobster failed to accommodate his medical condition and fired him while he was on medical leave; and The Lobster discriminated against and terminated older workers because of their age.

In response, on May 16, 2022, The Lobster filed a motion to compel arbitration.  Luis Garcia—The Lobster's operations manager—submitted a declaration in support of the motion attaching a stand-alone arbitration agreement Prell signed on

April 19, 2015, and another one he signed on July 21, 2020 that superseded the April 2015 agreement.[1]

Garcia declared that around April 20, 2015, he received the arbitration agreement signed by Prell and the general manager of The Lobster.  He put a scanned copy of the agreement in Prell's online personnel file.  Garcia declared that, as a result of the state-ordered closure of the restaurant in March 2020 due to the Covid-19 pandemic, Prell and all non-managerial personnel were terminated.  On July 21, 2020, Prell was re-hired, effective August 20, 2020.  When he was re-hired, Prell again was given a copy of The Lobster's employee handbook, its sexual harassment policy, and its form arbitration agreement.

Garcia signed the arbitration agreement on behalf of The Lobster.  Prell signed it on July 21, 2020.  Garcia's declaration also attached the acknowledgement of receipt of the employee handbook Prell signed that same day.  By signing the acknowledgement, Prell confirmed he "agreed to arbitrate certain employment-related disputes, as provided in Section 12.3 of the Handbook and in the separate Arbitration Agreement."  The signed arbitration agreement and acknowledgement were placed in Prell's personnel file.

---

[1]     Garcia became operations manager in March 2019.  He has worked for The Lobster since January 2014, "in charge of bookkeeping and personnel records."  In his reply declaration, Garcia confirmed he is the custodian of personnel records for The Lobster.  Garcia has maintained documents prepared since his employment "contemporaneous to" their preparation in the ordinary course of The Lobster's business "as part of [his] job function."

3

The July 2020 agreement[2] states that The Lobster and the employee—here, Prell—"agree that any claim, dispute, or controversy arising out of or relating to the employment or prospective employment by [The Lobster] of [e]mployee[,] which by law may be resolved by arbitration under the Federal Arbitration Act[,] shall be resolved by final and binding arbitration" under the terms and conditions specified in the agreement. As relevant here, under paragraph 1, the claims subject to arbitration include "tort claims, including . . . defamation, . . . wrongful discharge, . . .; statutory or common law claims for unlawful employment discrimination or harassment (including, without limitation, discrimination or harassment based on . . . age, . . . medical condition, handicap, disability, . . . or other unlawful basis); . . . and claims for violation of any federal, state or other governmental law, statute, regulation, order, ordinance, or provision, except claims expressly excluded under paragraph 2 of this Agreement."[3]

The agreement states JAMS shall administer the arbitration, and the arbitration "shall be governed by the JAMS Employment Arbitration Rules & Procedures in effect at the time of filing for arbitration. These Rules are available at http://www.jamsadr.com/rules-employment-arbitration/ and a condensed copy of them as currently drafted is attached

---

[2] From what we can tell, the terms of the 2015 and 2020 agreements are identical.

[3] As relevant here, paragraph 2 states the agreement does not hinder the employee's right "to file an administrative claim with[,] or to otherwise seek relief from, any government agency such as the Equal Employment Opportunity Commission."

4

hereto." Paragraph 8 of the agreement provides it "shall be governed by the Federal Arbitration Act and otherwise by the substantive law of the state of employment of [e]mployee. Arbitration shall be held at a JAMS location closest to [e]mployee's place of work for [The Lobster]."

The Lobster again was shut down by government order from December 29, 2020 through February 10, 2021. Garcia declared that, on February 8, 2021, The Lobster emailed Prell to tell him it no longer had a position for him because the restaurant could open for outdoor dining only.

Prell opposed the motion, contending the 2015 arbitration agreement was unenforceable, as the 2020 agreement superseded it; Labor Code section 432.6—which prevents an employer from conditioning employees' employment on their waiver of any " 'right, forum, or procedure for a violation of any provision' " of FEHA—rendered the 2020 arbitration agreement unenforceable; the Federal Arbitration Act did not apply to the agreements; and the agreements were unenforceable because they were products of duress, manufactured by undue influence, and unconscionable.

Prell submitted his, and another former employee's, declarations in support of his opposition. Prell declared he went on a medical leave of absence in March 2020. When he returned on July 21, 2020, a new general manager told Prell the employee handbook had been redone and he "needed to sign an acknowledgment that [he] received the handbook and go over paperwork" with Garcia. Prell met with Garcia, who handed him an arbitration agreement, "remarking[,] 'Here's . . . the arbitration agreement. You have to sign it. If you don't, we can't have you work here anymore.' " Prell declared that when he asked what it was, Garcia responded, " '[I]t's to protect you—

5

protect your job and allow you to keep your benefits.' " When Prell asked, " '[W]hat if I don't sign it,' " Garcia said, " 'Then we can't bring you back on. I do have some meetings to go to, so we have to take care of this right now,' or words to that effect." Prell declared Garcia and The Lobster "urged" him "to sign the arbitration agreement quickly, right there and then," and he "did so under pressure." The former employee similarly described having to sign an arbitration agreement when he returned to work after the 2020 closure that was not explained to him.

Prell declared he asked for a copy of the signed agreement but never was given a copy, although Garcia said he would do so. He also declared neither The Lobster nor its management ever told him what JAMS was, what rules "governed any proceeding before JAMS," or where he could find "such rules." Prell declared no one gave him the rules for JAMS.[4]

On August 17, 2022, after hearing the parties' arguments, the court adopted its tentative ruling to grant the motion to compel arbitration as its final order. The court first found the

---

[4]    As for the April 2015 arbitration agreement, Prell declared that, at a Saturday staff meeting, he and other staff members were told they had to sign the paper being passed out and return it by Monday if they wanted to keep their jobs. Prell declared he didn't know what the arbitration document was and no one would speak to him about it. Prell further declared that, on Monday when he told the general manager he didn't " 'feel comfortable signing this paper,' " the general manager told him, " 'then don't come to work—if you don't sign it then you just terminated yourself.' " The former employee declared he also was at that meeting and similarly described having to sign the arbitration agreement.

6

evidence established the parties agreed to arbitrate the dispute at issue, and both Garcia and Prell had authenticated the agreement. The court rejected Prell's argument that Labor Code section 432.6 rendered the agreement unenforceable, finding section 432.6 "has no application to this motion." The court noted the statute provides, " 'Nothing in this section is intended to invalidate a written arbitration agreement that is otherwise enforceable under the Federal Arbitration Act.' " (Quoting Lab. Code, § 432.6, subd. (f).)

The court next considered Prell's unconscionability defense. The court found the agreement was an "ordinary contract of adhesion," finding plaintiff "was not lied to, manipulated or subject to duress," and there was no surprise "as evidenced by the title 'Arbitration Agreement' in bold letters at the top" and Prell's "active attempt to avoid signing the agreement." The court also found no surprise based on the JAMS rules: the agreement provided a URL link to the rules and a copy was attached to the agreement. The agreement also explained the procedure and what was covered. Accordingly, the court found the agreement was "minimally procedurally unconscionable" based on its adhesive nature. The court also rejected Prell's claims of substantive unconscionability.

The court granted the motion and stayed the action pending the arbitration. The matter went to arbitration under the July 2020 arbitration agreement. The arbitrator found the proceedings were governed by the JAMS Employment Arbitration Rules and Procedures, effective June 1, 2021, and the merits were to be decided under California law and the Federal Arbitration Act. Hearings were held from August 22–25, 2023. The parties submitted closing briefs on September 20, 2023.

The arbitrator issued her final award on December 6, 2023. The arbitrator found in favor of The Lobster on all of Prell's claims, that no fees or costs were to be awarded to The Lobster, and that each party was responsible for its own attorney fees.

On December 18, 2023, The Lobster filed a petition to confirm the arbitration award. Prell opposed the petition and filed a cross-petition to vacate the award. On April 11, 2024, the court granted the petition to confirm the arbitration award and denied the motion to vacate it. On April 25, 2024, the court entered judgment in favor of The Lobster and against Prell. Prell appealed.[5]

## DISCUSSION

### 1. *Applicable law and standards of review*

Both the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (FAA) and the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) "strongly favor arbitration" (*Prima Donna Development Corp. v. Wells Fargo Bank, N.A.* (2019) 42 Cal.App.5th 22, 35), and "establish[ ] 'a presumption in favor of arbitrability' " (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (OTO)). The fundamental policy behind both acts is to " 'ensur[e] that private arbitration agreements are enforced according to

---

[5] Although Prell's notice of appeal from the judgment also covers the trial court's orders confirming the arbitration award and denying his motion to vacate the award, he makes no separate argument as to how the court erred in doing so. He thus has forfeited the issue on appeal. (See, e.g., *Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 753, fn. 2 [appellant " 'abandons an issue by failing to raise it in the opening brief' "].) Accordingly, we consider only whether the court erred in granting The Lobster's motion to compel arbitration.

8

their terms.' " (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 344 (*Concepcion*); *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 836, fn. 10.) "Arbitration is therefore a matter of contract." (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59.) Thus, arbitration agreements are enforceable unless invalidated under state law on grounds that exist for any contract, such as fraud, duress, and unconscionability. (9 U.S.C. § 2; Code Civ. Proc., § 1281; *Concepcion,* at p. 339; *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97–98 (*Armendariz*).) The FAA applies to arbitration agreements "involving"—meaning, " 'affecting' "— interstate commerce. (9 U.S.C. § 2; *Citizens Bank v. Alafabco, Inc.* (2003) 539 U.S. 52, 56 (*Alafabco*).)

A party seeking to compel arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing the petition bears the burden of establishing a defense to the agreement's enforcement. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.) " 'General principles of contract law determine whether the parties have entered a binding agreement to arbitrate.' " (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.) In resolving a petition to compel arbitration, "the trial court sits as the trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." (*Engalla*, at p. 972.)

"We review de novo the superior court's interpretation of an arbitration agreement, including whether federal or state law governing arbitration applies, when the interpretation does not

9

involve conflicting extrinsic evidence." (*Nixon v. AmeriHome Mortgage Co., LLC* (2021) 67 Cal.App.5th 934, 946; accord *Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 82 (*Carmona*) [appellate court reviews arbitration agreement de novo to determine whether it is legally enforceable, applying general principles of California contract law].) To the extent the trial court's determination of the issue turned on its resolution of disputed facts, we review the court's factual determinations for substantial evidence. (*Carmona*, at p. 82.) " 'When an issue is tried on affidavits, the rule on appeal is that those affidavits favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom . . . .' " (*American Express Centurion Bank v. Zara* (2011) 199 Cal.App.4th 383, 387.) We resolve any doubts about the validity of an arbitration agreement in favor of arbitration. (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686.)

**2.** ***Prell signed the arbitration agreement and the FAA applies***

Prell first contends the trial court erred in finding an arbitration agreement existed between the parties at all "because the April 2015 arbitration agreement was superseded and replaced by the July 2020 agreement." Prell's contention is not well-taken. The Lobster relied on the July 2020 agreement —not the April 2015 agreement—in its motion to compel. As it explains, The Lobster included the 2015 agreement with its moving papers to demonstrate Prell previously had signed an essentially identical agreement and thus was "well aware of" the agreement to arbitrate. The July 2020 agreement was

10

the operative agreement and Prell admitted he signed it.[6] Accordingly, the trial court properly found The Lobster met its burden to demonstrate an agreement to arbitrate existed between it and Prell.

Prell also challenges the trial court's implied finding that the FAA governs the agreement. Prell primarily contends that, because The Lobster provided no evidence that he performed any of his job duties outside of California, it failed to demonstrate their employment relationship implicated interstate commerce. The employee need not perform work out of state for the employee-employer "transaction" (9 U.S.C. § 2) to affect interstate commerce, however. The FAA does not require the transaction actually to be " 'within the flow of interstate commerce.' " (*Alafabco*, *supra*, 539 U.S. at p. 56, quoting *Allied-Bruce Terminix Companies, Inc. v. Dobson* (1995) 513 U.S. 265, 273; see also *Alafabco,* at pp. 56–57 ["Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice . . . subject to federal control.' "].) Garcia declared The Lobster "nearly daily has air transported in large orders [of] seafood" to prepare and serve to guests; and "advertises via the Internet

---

[6] Accordingly, Prell has no basis to challenge the authenticity of the agreement. In any event, we agree with the trial court that Garcia sufficiently authenticated the document. He declared he was "in charge of . . . personnel records," was the custodian of "such records" for The Lobster, and—as part of his job duties—kept those employment records, including Prell's, contemporaneous to the documents' preparation in the ordinary course of business.

11

and otherwise internationally, including by print ads placed in airline magazines." Garcia also declared that The Lobster's Executive Chef and Director of Operations had traveled internationally as The Lobster's representative, most recently to England.[7] Prell challenges Garcia's statements "as conclusions without any foundation." He also argues that, if the activities Garcia described were sufficient to trigger application of the FAA, every business "would be subject to the FAA automatically for using their cell phone, or having a bank account."

Arguably, if The Lobster flew seafood in *from other states*[8] that it then served its customers, Prell's employment would affect interstate commerce. (See, e.g., *Herrera v. Doctors Medical Center of Modesto, Inc.* (2021) 67 Cal.App.5th 538, 542 [owner and operator of medical center was engaged in interstate commerce through purchase of "equipment, materials and supplies from out-of-state manufacturers and suppliers"]; *Shepard v. Edward Mackay Enterprises, Inc.* (2007) 148 Cal.App.4th 1092, 1101 [concluding sales agreement for home purchase affected interstate commerce because building materials used in construction of home were "manufactured and/or produced outside California"].) We need not decide that issue, however. Although the FAA by its terms (9 U.S.C. § 2) applies to contracts that involve interstate commerce,

---

[7] In his initial declaration, Garcia declared that *he* had "travelled internationally to promote the brand." Garcia corrected that misstatement in his reply declaration.

[8] Garcia declared The Lobster had seafood flown in but did not state from where the shipments came.

12

"the presence of interstate commerce is not the only manner under which the FAA may apply." (*Victrola 89, LLC v. Jaman Properties 8 LLC* (2020) 46 Cal.App.5th 337, 355 [parties "voluntarily elect[ed] to have the FAA govern enforcement of the[ir] [a]greement"].) Rather, as "arbitration is a matter of contract, the FAA also applies if it is so stated in the agreement." (*Barrera v. Apple American Group LLC* (2023) 95 Cal.App.5th 63, 76 [agreeing FAA applied as the parties' agreements "provide[d] the FAA would control"]; *Davis v. Shiekh Shoes, LLC* (2022) 84 Cal.App.5th 956, 963 [same].)

Accordingly, the FAA applied to the arbitration agreement here because the agreement expressly states it does. Not only does the preamble to the agreement state the parties agree to resolve employment-related claims by arbitration under the FAA, but paragraph 8 also states the FAA governs the agreement: "This Agreement shall be governed by the Federal Arbitration Act and otherwise by the substantive law of the state of employment of Employee." Our interpretation of the agreement thus is governed by the FAA and California law, to the extent it is not inconsistent with the FAA.

Prell contends that even if the FAA applies, the arbitration agreement was unenforceable under Labor Code section 432.6 (enacted as part of Assembly Bill No. 51 (AB 51)). That statute, effective January 1, 2020, provides: "A person shall not, as a condition of employment, continued employment, or the receipt of any employment-related benefit, require any applicant for employment or any employee to waive any right, forum, or procedure for a violation of any provision of the [FEHA] or [the Labor] [C]ode, including the right to file and pursue a civil action . . . with . . . any court . . . ." (Lab. Code, § 432.6,

13

subd. (a).) There is no dispute that The Lobster conditioned Prell's reemployment on his agreement to arbitrate employment-related claims, including those brought under the FEHA. Prell, however, neglects to note the Ninth Circuit Court of Appeals—after granting rehearing—withdrew the opinion Prell cites and issued a new opinion holding the FAA preempts AB 51, including Labor Code section 432.6. (See *Chamber of Commerce of U.S. v. Bonta* (9th Cir. 2023) 62 F.4th 473, 478 (*Bonta II*).) (Prell relies on *Chamber of Commerce of U.S. v. Bonta* (9th Cir. 2021) 13 F.4th 766, 780 [holding "regulation of pre-agreement employer behavior in § 432.6 does not run afoul of the FAA, but the civil and criminal sanctions attached to a violation of that section do" and are preempted by the FAA], withdrawn and resubmitted for rehearing by (9th Cir. 2022) 45 F.4th 1113 (Mem.).)[9]

---

[9] AB 51 also added Government Code section 12953 that makes a violation of section 432.6 " 'an unlawful employment practice.' " (*Bonta II, supra*, 62 F.4th at p. 480.) Section 433 of the Labor Code in turn makes a violation of section 432.6—part of Article 3 of the Labor Code—a misdemeanor offense. (*Bonta II*, at p. 480; Lab. Code, § 433 ["Any person violating [Article 3] is guilty of a misdemeanor."].) Finding "all provisions of AB 51 work together to burden the formation of arbitration agreements," on rehearing—in a divided decision—the Ninth Circuit concluded the FAA preempted "AB 51 as a whole to the extent it applies to arbitration agreements." (*Bonta II*, at p. 490.) The court explained that, "regardless whether AB 51 includes a civil penalty, it 'specially impede[s] the ability of [employers] to enter into arbitration agreements' and 'flout[s] the FAA's command to place those agreements on an equal footing with all other contracts.' " (*Ibid.*)

14

In any event, Labor Code section 432.6 provides, "Nothing in this section is intended to invalidate a written arbitration agreement that is otherwise enforceable under the [FAA]." (Lab. Code, § 432.6, subd. (f).)  (See *Bonta II, supra*, 62 F.4th at p. 480 [noting the California Legislature included subdivision (f) to avoid FAA preemption, but the provision "resulted in the oddity that an employer subject to criminal prosecution for requiring an employee to enter into an arbitration agreement could nevertheless enforce that agreement once it was executed"].)  Accordingly, as we conclude below that the July 2020 agreement is "otherwise enforceable," Labor Code section 432.6 would have no effect on the agreement's enforceability, even if it were not preempted.

3.     ***Prell did not present sufficient evidence to establish the agreement was a product of duress or undue influence***

Consent to a contract must be freely given.  (Civ. Code, § 1565.)  Apparent consent is not free when obtained through duress, menace, fraud, undue influence, or mistake.  (Civ. Code, § 1567.)  As he did below, Prell seems to argue he did not consent to the agreement because (1) he signed it under duress—under threat of "los[ing] his livelihood"; and (2) it was the product of undue influence given he was "unduly susceptible to [The Lobster's] domination" as a long-time employee, and The Lobster placed " 'excessive pressure' " on him to sign the agreement. In its written ruling, the trial court did not specifically address Prell's duress and undue influence arguments.  We can infer the court impliedly rejected them when it found the agreement was "minimally procedurally unconscionable."

15

"Economic duress requires an unlawful or 'wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.' [Citation.] 'Examples of such "wrongful acts" include "[t]he assertion of a claim known to be false or a bad faith threat to breach a contract or to withhold a payment . . . ." ' " (*Hester v. Public Storage* (2020) 49 Cal.App.5th 668, 679, relied on by Prell.) Prell has not demonstrated The Lobster committed any wrongful act to constitute duress. Offering the arbitration agreement on a take-it-or-leave-it basis may have rendered it procedurally unconscionable on some level, but it did not constitute a wrongful act on The Lobster's part. Prell nonetheless argues The Lobster's arbitration condition was a wrongful act under Labor Code section 432.6. As the FAA preempts that statute, its alleged violation cannot constitute a wrongful act for purposes of determining the validity of the arbitration agreement.[10] Prell also declared he "could not afford to be out of a job or medical benefits." Prell may have felt he had no alternative but to accept The Lobster's return-to-work offer, but the circumstances that influenced that decision did not result from wrongful conduct by The Lobster.

---

[10] Moreover, California officials have been permanently enjoined from enforcing Labor Code section 432.6, subdivisions (a)–(c) "where the alleged 'waiver of any right, forum, or procedure' is the entry into an arbitration agreement that is covered by the [FAA]." (*Chamber of Commerce of U.S. v. Bonta* (E.D.Cal., Jan. 2, 2024, No. 2:19-cv-02456-KJM-DB) 2024 WL 3564626.)

Undue influence, in turn, includes "the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority" to obtain an "unfair advantage"; "taking an unfair advantage of another's weakness of mind"; or "taking a grossly oppressive and unfair advantage of another's necessities or distress." (Civ. Code, § 1575.) "In essence undue influence involves the use of excessive pressure to persuade one vulnerable to such pressure, pressure applied by a dominant subject to a servient object. In combination, the elements of undue susceptibility in the servient person and excessive pressure by the dominating person make the latter's influence undue." (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 131 (*Odorizzi*).)

Undue influence is a question of fact. Substantial evidence supports the court's implied finding that Prell's agreement to arbitrate was not the product of undue influence. For one, nothing in the record supports a finding that Prell had a diminished capacity at the time he signed the agreement, and he was not in a confidential or fiduciary relationship with The Lobster. Prell nonetheless argues he was "unduly susceptible" to his employer's "domination" because he had worked for The Lobster for many years as a lead server and his only choice was to sign the arbitration agreement "or be out of a job." Susceptibility in this context means "a lessened capacity" "to make a free contract." (*Odorizzi, supra*, 246 Cal.App.2d at p. 131; see also *Martinez-Gonzalez v. Elkhorn Packing Co. LLC* (9th Cir. 2022) 25 F.4th 613, 619, 625–626 (*Martinez-Gonzalez*) [citing *Odorizzi* and finding arbitration agreements were not invalid under California law under doctrine of undue influence (and doctrine of economic duress)].) In our view, the length of

17

Prell's employment with The Lobster does not support finding he was "unduly susceptible" to pressure from The Lobster to sign the arbitration agreement. (Cf. *Odorizzi*, at pp. 126–127, 131–132 [teacher who sought to rescind his resignation—and reinstate his employment—on ground of undue influence sufficiently pleaded undue susceptibility where he signed his resignation after having been arrested, questioned, booked, and released on bail, and having gone without sleep for 40 hours].) There is no evidence Prell couldn't rationally assess whether he wanted to sign an arbitration agreement again or go to work elsewhere.

We also cannot conclude that The Lobster's conditioning of Prell's employment on his signing of the arbitration agreement rose to the level of "taking a grossly oppressive and unfair advantage of [Prell's] necessities or distress," so that Prell's consent was not given freely. (*Odorizzi, supra*, 246 Cal.App.2d at p. 130.) "[O]verpersuasion"—i.e., "excessive pressure"—involves several factors, including, "discussion of the transaction at an unusual or inappropriate time" and "consummation of the transaction in an unusual place"; "insistent demand that the business be finished at once"; "extreme emphasis on untoward consequences of delay"; "absence of third-party advisers"; and "statements that there is no time to consult financial advisers or attorneys." (*Id*. at pp. 133–134.) Far from an unusual time or place, Prell was asked to sign the agreement on his return to work at The Lobster. True, Garcia pressed Prell to sign the agreement quickly—Prell declared he had to sign the agreement "right there and then, and did so under time pressure" without "an opportunity to consider the document." But the evidence does not support a finding that The Lobster obtained Prell's agreement to arbitrate by taking an unfair advantage of a

18

vulnerable individual. In *Odorizzi*, on which Prell relies, the plaintiff teacher sufficiently alleged "excessive pressure" where the school board told him that, "if he didn't resign at once," the board would dismiss him "and publicize the proceedings," but if he did resign the incident leading to his arrest and criminal charges—which ultimately were dismissed—would not be publicized and "wouldn't jeopardize" his chances of securing a teaching position elsewhere. (*Id.* at pp. 126–127, 134–135.)

There is no evidence The Lobster put similar pressure on Prell or that Prell was susceptible to succumbing to such pressure as was the teacher in *Odorizzi*. The choice Prell had—to sign the arbitration agreement or to find work elsewhere—may have seemed harsh, but there is no evidence Prell was " 'so dominated' " by pressure from The Lobster's agents as to be unable to exercise his independent judgment. (*Odorizzi, supra*, 246 Cal.App.2d at p. 135*;* cf. *id.* at pp. 132–134 [giving examples of oppressive cases: approaching pregnant woman four days after her husband was shot to death while she was in shock and persuading her to deed her interest in late husband's estate to children from his earlier marriage; asking for a release of claims from a patient confined in a cast in a hospital who was in a hysterical state and in so much pain she signed the release to end the interview; and arriving unannounced at an individual's house at 1:00 a.m. and insisting that if she did not sign a document right then her real estate transaction would fall apart]; *Martinez-Gonzalez, supra*, 25 F.4th at p. 627, fn. 9 [describing cases discussed in *Odorizzi* as "illustrat[ing] the sort of extreme pressure that California courts consider as 'extraordinary force' "].) Nor is there any evidence Prell ever asked to consult

19

with an attorney or other adviser, or that Garcia told him he could not.

Accordingly, we conclude Prell presented insufficient evidence to establish he did not voluntarily agree to arbitrate his claims.

4.      ***The agreement is not unconscionable***

Prell's final defense to the enforcement of the arbitration agreement is that it is unconscionable. "A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." (*OTO, supra,* 8 Cal.5th at p. 125.) "Under this standard, the unconscionability doctrine ' "has both a procedural and a substantive element." ' [Citation.] 'The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.' " (*Ibid.*) Both procedural and substantive unconscionability must be present for a court to be able to refuse to enforce a contract or a contract term, including an arbitration agreement, under the doctrine of unconscionability. (*Armendariz, supra,* 24 Cal.4th at p. 114.) "But they need not be present in the same degree." (*Ibid.*) "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*) The party opposing arbitration bears the burden of proving unconscionability. (*OTO,* at p. 126.)

20

a.    *The agreement contains some procedural unconscionability*

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' " (*OTO, supra*, 8 Cal.5th at p. 126.)  "An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*Ibid.*)  There is no question the form arbitration agreement here—offered as a condition of Prell's employment— was an adhesive contract.  (*Ibid.*)  But in the words of the trial court, "most employment contracts are."  (See *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817–818 [adhesion contracts "are an inevitable fact of life"].)  The fact the arbitration agreement is a contract of adhesion "does not render it automatically unenforceable as unconscionable."  (*Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 179 (*Serafin*).)  Rather, "[t]he pertinent question . . . is whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required. [Citations.]  ' " 'Oppression occurs where a contract involves lack of negotiation and meaningful choice, *surprise* [occurs] where the allegedly unconscionable provision is hidden within a prolix printed form.' " ' " (*OTO,* at p. 126.)

" 'The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review

21

of the proposed contract was aided by an attorney.' " (*OTO, supra*, 8 Cal.5th at pp. 126–127.)

Here, Prell established the arbitration agreement was not a negotiated contract, and he lacked "meaningful choice," through his declaration that Garcia told him he could not " 'work here anymore' " if he didn't sign the arbitration agreement; Garcia "urged" him to sign the agreement "quickly, right there and then"; and no one at The Lobster "approached" him "to negotiate an arbitration term or provision," nor was he "advised" that he "could reject, negotiate, re-negotiate, bargain for, or change any arbitration term or provision."

"When arbitration is a condition of employment, there is inherently economic pressure on the employee to accept arbitration. This alone is a fairly low level of procedural unconscionability." (*Alvarez v. Altamed Health Services Corp.* (2021) 60 Cal.App.5th 572, 591 (*Alvarez*).) In *Alvarez*, the appellate court reversed a trial court's order denying the defendant's motion to compel arbitration on the ground the agreement was unconscionable. (*Id.* at pp. 578, 596.) There, the plaintiff—a prospective employee—was told she had a day to review her offer letter and accompanying arbitration agreement—although she appeared to have taken more time— and, because she "had a physical copy of the agreement in her control for at least 24 hours," she could have made a copy of it if she wished. (*Id.* at p. 591.) English was not the plaintiff's first language, but she was comfortable speaking and reading English and thus her preference to read difficult legal terms in Spanish did not demonstrate she was unable to understand the agreement. (*Id.* at pp. 589, 591.) The plaintiff also presented no evidence about her education or experience or whether she

22

consulted an attorney. The court thus found the plaintiff had "not shown any oppression apart from that inherent in the adhesive nature of the agreement." (*Id.* at p. 591.)

Prell did not have time to consider the arbitration agreement before signing it as did the plaintiff in *Alvarez*. Nevertheless, Prell already had signed a virtually identical stand-alone agreement five years earlier. Prell also never declared he would have consulted an attorney about the agreement if he had not been expected to sign it "right there and then." Prell declared he did not receive a copy of the 2020 —or 2015—agreement, but substantial evidence shows he had access to it through his online personnel record.[11]

Moreover, Prell does not contend he was lied to or tricked into signing the agreement to support a finding that more than a modest level of procedural unconscionability existed. (*Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 248 (*Nguyen*), quoting *Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1245 (*Baltazar*) [noting " '[t]he adhesive nature of the

---

[11] Garcia declared the agreement and JAMS rules were available to Prell in his personnel folder "to which [he] was given access." Prell declared he did not have access to his personnel file while he worked at The Lobster nor was he "ever informed that it existed online" or how "to access any of [his] hiring or other employee records online." Garica declared The Lobster's records showed that, on May 20, 2015, Prell "activate[d] his online access to his personnel records" through The Lobster's "Paychex HR online portal." We can infer the trial court found Garcia's declaration more credible than Prell's and implicitly found Prell had the ability to access his personnel records, including the agreement.

23

employment contract requires us to be "particularly attuned" to [the plaintiff's] claim of unconscionability [citation], but we do not subject the contract to the same degree of scrutiny as "[c]ontracts of adhesion that involve surprise or other sharp practices" ' "].) In *Baltazar*, as the trial court explained, the employer presented the plaintiff with a form arbitration agreement that she initially refused to sign. (*Baltazar*, at pp. 1241, 1245.) After the plaintiff was told, " 'sign it or no job,' " she signed the agreement. (*Id.* at p. 1241.) Although the agreement was adhesive in nature, because "there was no element of surprise," and the plaintiff "was not lied to, placed under duress, or otherwise manipulated into signing the arbitration agreement," the agreement did not fall into the category of adhesive contracts requiring a higher degree of scrutiny. (*Id.* at p. 1245.) As the trial court found here, Prell similarly "not only knew about the arbitration agreement, but initially sought to avoid it, ultimately deciding to accept it because [his employer] was not willing to [rehire him] on other terms." (*Ibid.*)

Also, the physical aspects of the document here were neither oppressive nor did they result in surprise: the two-page agreement appears to be written in average-sized—rather than extremely small—font and consists of a six-line preamble and nine separately numbered paragraphs, the longest of which is 17 lines. (Compare *Alvarez, supra*, 60 Cal.App.5th at pp. 583, 592 [physical document did not give rise to surprise where agreement was not long—two pages, consisting of six paragraphs, the longest of which was 23 lines—and was not physically difficult to read] with *OTO, supra*, 8 Cal.5th at p. 128 [facts supported finding of surprise where agreement was "a paragon of prolixity, only slightly more than a page long but written in

24

an extremely small font," where the "single dense paragraph covering arbitration require[d] 51 lines," and where the text was " 'visually impenetrable' and 'challenge[d] the limits of legibility' "].) The sentences within each paragraph are not particularly lengthy,[12] nor are the paragraphs overly dense. (Cf. *OTO*, at p. 128 [substance of agreement was opaque where sentences were lengthy and "complex, filled with statutory references and legal jargon"].)

Moreover, although there was an inequality in bargaining power here, there was no lack of disclosure of the arbitration agreement and thus no surprise. The arbitration agreement was a stand-alone, two-page document prominently titled "<u>ARBITRATION AGREEMENT</u>" in bold face type. The final paragraph above the signature block clearly stated, "The parties understand by agreeing to binding arbitration they are waiving and foregoing [*sic*] any right to a trial by jury on the claims subject to arbitration." The agreement to arbitrate and to give up a right to jury trial, therefore, was not buried in a paragraph of dense text, as in *OTO*. "[W]here the arbitration provisions presented in a contract of adhesion are highlighted for the employee, any procedural unconscionability is 'limited.' " (*Serafin*, *supra*, 235 Cal.App.4th at p. 179 [concluding "arbitration provisions were unquestionably highlighted for [employee] in the two-page, freestanding document, relating

---

[12] The sentence listing the types of claims that fall within the scope of the arbitration agreement necessarily spans several lines, but the categories of claims are separated by semi-colons. We do not find it particularly difficult to read given the long list of covered claims.

solely to arbitration, that she received and signed"].) Prell also had signed on July 21, 2020, an acknowledgement that he had received The Lobster's employee handbook and understood he had "agreed to arbitrate certain employment-related disputes, as provided in Section 12.3 of the Handbook and in the separate Arbitration Agreement." That Prell was not surprised by the agreement also is evident—as the trial court found—by his "active attempt to avoid signing" it.

Prell nevertheless contends the agreement was procedurally unconscionable because he was not given "arbitration terms or its rules." Prell argues the agreement did not describe how the arbitration would be conducted, "the rules for such process, or what relief would be available." Prell declared he never was given a copy of the agreement, or a copy of the JAMS rules, and was not told what JAMS was, "what rules governed any proceeding before JAMS," or where he could find the JAMS rules. He argues The Lobster's "own documentation fails to specify which JAMS rules apply."

We reject Prell's contentions. First, the agreement clearly states the arbitrator has the power to award "all sums and forms of relief as could be awarded or granted" in a civil action based on the same claims of relief. Second, the agreement expressly states the arbitration "shall be administered by JAMS" and "governed by the JAMS Employment Arbitration Rules & Procedures *in effect at the time of filing for arbitration.*" (Italics added.) The agreement also provides a direct URL link to those rules and states that a condensed copy of the rules is attached. Even if Prell did not receive a copy of the rules, as he declares, he easily could access them through the internet from the link. (See *Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676,

691 [failure to attach copy of AAA rules did not render agreement procedurally unconscionable where "[t]here could be no surprise, as the arbitration rules referenced in the agreement were easily accessible to the parties—the AAA rules were available on the internet"].)

Relying on *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, Prell contends the reference to arbitration rules without attaching them to the contract renders the agreement procedurally unconscionable because " '[t]he customer is forced to go to another source to find out the full import of what he or she is about to sign—and must go to that effort prior to signing.' " (Quoting *Harper*, at p. 1406.) *Harper* is inapposite. There, the referenced arbitration rules at issue "limit[ed] the damages and remedies available to dissatisfied customers." (*Id.* at p. 1405.) The agreement thus contained both oppression and surprise: the customer's "inability to receive full relief" was "artfully hidden by merely referencing" the rules, and the customer "must inevitably receive a nasty shock when he or she discover[ed] that no relief [was] available." (*Id.* at p. 1406.) The rules' harsh effect on the plaintiffs' ability to recover also rendered the agreement substantively unconscionable. (*Id.* at pp. 1407–1408.) No such surprise or oppression is present here.

*Baltazar* is instructive. There, the plaintiff contended that a higher degree of procedural unconscionability was present —"warranting closer scrutiny of the substantive fairness of the agreement's terms"—because the employer did not provide her with a copy of the AAA rules that governed any arbitration between the parties. (*Baltazar, supra*, 62 Cal.4th at p. 1246.) Our high court rejected the plaintiff's contention because her challenge to the enforcement of the agreement had nothing

27

to do with any element of the AAA rules.  (*Ibid.*)  Similarly, here, Prell's unconscionability challenge does not concern the substance of the JAMS rules themselves—he does not argue a substantively unconscionable term of the agreement was hidden within the rules, as in *Harper*, for example.  Accordingly, the fact Prell allegedly did not receive a hard copy of the then-current JAMS rules did not cause the agreement to attain a higher degree of procedural unconscionability.  In any event, " 'simply because a provision within a contract of adhesion is not read or understood by the nondrafting party does not justify a refusal to enforce it.  The unbargained-for term may only be denied enforcement if it is also *substantively* unreasonable.' " (*Nguyen, supra*, 4 Cal.App.5th at p. 249.)

In sum, as there was no surprise (or claim of sharp practices), we conclude the degree of procedural unconscionability here did not rise far above that of an "[o]rdinary contract[ ] of adhesion."  (*Baltazar, supra*, 62 Cal.4th at p. 1244.)

b.    *The agreement is not substantively unconscionable*

" 'Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.  [Citations.]  A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be "so one-sided as to 'shock the conscience.' " ' " (*Carmona, supra*, 226 Cal.App.4th at p. 85.)  "[T]he paramount consideration in assessing [substantive] conscionability is mutuality." (*Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 657.)

Prell contends the agreement is substantively unconscionable because it (1) lacks mutuality, (2) precludes

28

class-wide relief, (3) provides for inadequate discovery, and (4) limits recovery of attorney fees. His contentions fail.

Prell's first contention is not well-taken. The agreement is not one-sided—it requires both parties to arbitrate claims arising from Prell's employment by The Lobster. Nor do the express terms of the agreement exclude the claims Prell asserts it does: the arbitrator is empowered to award "all . . . forms of relief" available in court, which would include injunctive and other equitable relief; and claims of unfair competition or unauthorized use or disclosure of trade secrets/confidential information would fall under the agreement's coverage of "tort claims."

Prell cites no authority to support his contention that the agreement's preclusion of representative claims renders the agreement substantively unconscionable. The agreement requires all claims to be brought in a party's individual, not representative, capacity, "[e]xcept as proscribed by law and consistent with the [FAA]." Prell argues this provision "render[s] PAGA[13] and class representative actions impotent," but Prell's complaint did not assert any representative claims against The Lobster, much less any PAGA claims. In any event, arbitration agreements that contain class action waivers are not unconscionable under the FAA. (See *Concepcion, supra*, 563 U.S. at pp. 336, 352 [FAA preempts California's rule conditioning enforceability of arbitration agreements on the availability of classwide arbitration procedures].) As Prell does not assert a PAGA claim against The Lobster, we need not determine whether

---

[13] We presume Prell is referring to the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.).

29

the agreement's exclusion of representative actions constitutes a waiver of representative PAGA claims. (See *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639, 649 [arbitration agreement may require arbitration of individual PAGA claim]; *Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1123 [employee compelled to arbitrate individual PAGA claim may litigate non-individual claim in court].)

Prell next argues the agreement provides for an "inadequate amount of discovery." The agreement expressly provides, "The parties shall be entitled to fair pre-arbitration discovery." Prell seems to contend that the effect of this provision is to enable the arbitrator "to severely limit written discovery and number of depositions in comparison to that allowed in civil court." He claims he identified more than 10 witnesses whom he needed to depose. As Prell notes, employees are "at least entitled to discovery sufficient to adequately arbitrate their statutory [FEHA] claim[s]." (*Armendariz, supra*, 24 Cal.4th at p. 106.) On appeal, Prell has not demonstrated how the agreement limits his ability to obtain necessary discovery.

As the trial court noted, " 'adequate' discovery does not mean unfettered discovery and *Armendariz* itself recognizes an arbitration agreement may require 'something *less than* the full panoply of discovery provided in Code of Civil Procedure section 1283.05.' " (*Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 184 & fn. 43, quoting *Armendariz, supra*, 24 Cal.4th at pp. 105–106.) The Lobster argues the JAMS rules enable adequate discovery. Although Prell does not mention it on appeal, as The Lobster notes, JAMS Rule 17 provides each party "may take at least one deposition of an opposing Party or an individual under the control of the opposing Party" and the

30

arbitrator may "grant a request for additional depositions, based upon the reasonable need for the requested information." (JAMS Employment Arbitration Rules & Procedures, Rule 17(b), effective June 1, 2021, <https://www.jamsadr.com/rules-employment-arbitration/english#Rule-17> [as of Aug. 27, 2025], archived at <https://perma.cc/3G3N-YR8Z>.)  Prell's counsel declared he anticipated taking depositions of six former coworkers and six managers.

The trial court found Prell and his attorney's "self-serving declarations . . . that there are more than 10 witnesses that need to be deposed . . . is insufficient to demonstrate the discovery rules are unconscionable, particularly in light of the JAMS rule that the arbitrator can grant additional depositions based upon a showing of 'reasonable need.' "  We agree.  Prell's counsel's declaration did not make a showing of reasonable need for 10 or more depositions, nor did Prell demonstrate the arbitrator would deny his request for additional depositions upon a showing of reasonable need.[14]  Prell has failed to meet his burden that the agreement did not provide for adequate discovery.

Finally, Prell argues the agreement "[l]imits appellant's relief with Attorney's Fees [*sic*]."  Prell relies on *Trivedi v. Curexo Technology Corp.* (2010) 189 Cal.App.4th 387, which was disapproved of on another ground in *Baltazar, supra*, 62 Cal.4th at p. 1248.  There, the appellate court found an arbitration agreement substantively unconscionable where it allowed for recovery of attorney fees and costs by the prevailing party because it placed the employee at greater risk than if he

---

[14]    As The Lobster notes, in the end, Prell sought only one deposition.

litigated his FEHA claims in court, where a prevailing employer only would be able to recover fees and costs if the employee's claims were frivolous, unreasonable, without foundation, or brought in bad faith. (*Trivedi,* at pp. 394–395.) The provision here is not the same. The arbitrator may award all relief as in a civil action based on the same claims, including recovery of attorney fees and costs. Accordingly, as a court would not be able to award The Lobster fees and costs if it prevailed on Prell's FEHA claims absent the above showing, neither can the arbitrator. And, as Prell would be entitled to attorney fees under the FEHA if he prevailed in court, he also is entitled to them under the agreement.

Accordingly, we conclude the trial court correctly found that the agreement lacks substantive unconscionability and the agreement was enforceable.

Because we conclude the trial court did not err in finding the arbitration agreement enforceable, we need not consider The Lobster's contention that, because the agreement included a delegation clause, Prell waived any challenge to arbitrability by failing to seek a determination from the arbitrator.

**5.** *The court did not abuse its discretion by not hearing oral testimony*

As his final contention of error, Prell argues the disputed evidence before the court required it to hold an evidentiary hearing "as a matter of proper procedure and due process." We disagree. We review for abuse of discretion a trial court's decision as to whether to hear oral testimony. (*Jones v. Solgen Construction, LLC* (2024) 99 Cal.App.5th 1178, 1203 (*Jones*).) Even where the " 'better course' " would be to conduct an evidentiary hearing, "the fact that the 'better course' was not

32

pursued does not mean that the court abused its discretion." (*Id*. at pp. 1203–1204.) Rather, an abuse of discretion exists where the trial court " ' " ' "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' " (*Id*. at p. 1203.)

Prell contends there are "significant disputed factual issues concerning what appellant signed," but we find none. Prell did not declare the signature on the arbitration agreements attached to Garcia's declaration are not his or that the arbitration agreement he signed included different terms than the signed agreement submitted to the court. In contrast, in *Ashburn v. AIG Financial Advisors, Inc.* (2015) 234 Cal.App.4th 79 (*Ashburn*), on which Prell relies, the appellate court found that, given the parties disputed whether the agreement at issue contained an arbitration agreement at all, the best course was for the trial court to hear oral testimony and give each party an opportunity to cross-examine the other. (*Id*. at pp. 98–99.)

Prell also contends a hearing was necessary because disputed factual issues existed here as to what he was told and how he came to sign the agreement, and there was "extensive evidence that [The Lobster] stood in a 'significant relationship' with [Prell] before he signed any documents." There were some contradictions between Prell's and Garcia's declarations about what Prell was told or what he said when presented with the 2020 agreement, but we can infer the trial court presumed Prell's declaration of the events was true, as we have in our analysis. There also was a discrepancy as to whether Prell could access his online personnel file, but we find no abuse of discretion in the court's implied resolution of that discrepancy without the aid of oral testimony. None of the disputed facts here was as

33

"profound and extensive" as those in *Ashburn*. (See *Jones, supra*, 99 Cal.App.5th at pp. 1204–1205 [describing parties' disputes in *Ashburn*: they could not agree on what the agreements were called, what appellants signed, whether alleged meetings took place, or what the signed documents said].) Moreover, in *Ashburn*, the court did not exercise its discretion at all. (See *Ashburn, supra*, 234 Cal.App.4th at p. 97.) Here, Prell asked for an evidentiary hearing and none took place. "Although the court did not explain its implicit denial, we presume that the court exercised its discretion in denying the request." (*Jones,* at p. 1204.) We find no abuse of discretion in the court's decision not to hold an evidentiary hearing based on the circumstances here.

## DISPOSITION

We affirm the judgment.  The parties are to bear their own costs on appeal.  (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 950–951.)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


GAAB, J.[*]

---

[*]    Judge of the Fresno County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.